[No. S004516. Crim. No. 23020. Dec. 23, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES FREDERICK NEELY, Defendant and Appellant.

878

## COUNSEL

Karen S. Sorensen, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Edmund D. McMurray, Roger E. Venturi and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GEORGE, J.—Following the guilt phase of a jury trial, defendant Charles Frederick Neely was found guilty of one count of first degree murder (Pen. Code, §§ 187, 189),[1] one count of robbery (§ 211), and one count of burglary (§ 460). The jury also found that defendant used a firearm in the commission of each offense (§ 12022.5) and had served a prior prison term (667.5, subd. (a)), and found true two special-circumstance allegations: that he committed the murder during the course of a robbery and burglary[2] (§ 190.2, subd. (a)(17)) and that he previously had been convicted of murder (§ 190.2, subd. (a)(2)). After the penalty phase of the trial, the jury imposed the death penalty.

In the companion habeas corpus proceeding, we conclude that the judgment must be vacated in its entirety. (*In re Neely, post*, p. 901, 906 [26 Cal.Rptr.2d 203, 864 P.2d 474].) Therefore, many of the issues raised on the direct appeal need not be resolved, and we dismiss the appeal itself as moot. For the guidance of the trial court in the event of a retrial, however, we shall address those issues that are likely to arise upon retrial.

### FACTS

## I. GUILT PHASE

### A. *Prosecution's case.*

The victim, Bruce Chester, a realtor, conducted his business from his residence on Cameron Road in Cameron Park, where he also kept small amounts of marijuana and cocaine for his personal use. On March 15, 1982, defendant, Malcolm Centers, and Monte Handley robbed Chester at his residence, and defendant shot and fatally wounded him.[3]

### i. *Pre-crime planning.*

Several years prior to the commission of the crimes, Chester's daughter, Julie Marie, was a schoolmate of Centers at the Cameron Park elementary

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury found true a single special-circumstance allegation that defendant committed the murder "during the commission of a ROBBERY/BURGLARY . . . ."

[3] Defendant and codefendants Centers and Handley were charged jointly with the commission of the crimes. Pursuant to a plea agreement with the prosecution, Handley pleaded guilty to the offense of robbery with a firearm-use enhancement, and the remaining charges were dismissed. On defendant's motion, the trial court ordered defendant's trial severed from Centers's trial. At his trial (which occurred subsequent to defendant's trial), Centers was acquitted of murder, convicted of the offenses of conspiracy to commit robbery and conspiracy to commit burglary, and sentenced to a five-year prison term.

school. At that time, the Chesters resided in a different house (not the crime scene), where Centers occasionally visited Julie Marie. On one occasion in 1981, Centers appeared unexpectedly at the Chester residence on Cameron Road (the crime scene) and spoke briefly with Julie Marie.

Quintin Jones, a convicted felon, was an acquaintance of both Centers and Handley. He testified that during the week preceding the commission of the crimes, he had several conversations with Centers at Centers's Sacramento apartment relating to a plan to burglarize a Cameron Park residence. During the first conversation, Centers told Jones that he recently had committed a robbery, and invited Jones to participate in a burglary of a Cameron Park residence. At the second meeting, on March 12, Centers mentioned that a third person would be involved in the burglary, and assured Jones that none of the residents would be present. On the morning of March 13, Jones again spoke with Centers at Centers's apartment. On this occasion, defendant was present, seated on a sofa. When Jones inquired whether defendant would participate in the burglary, Centers replied affirmatively and said they would be bringing handcuffs and Mace. He also assured Jones there was cash and a gold Buddha in the residence inside a safe. Jones observed the black handle and barrel of a gun, similar to a Luger-type firearm, beneath the sofa cushion on which defendant was seated. Defendant told him he had been surveilling the Cameron Park residence for a period of time and knew that no one would be home. Following a further conversation with Centers, Jones decided not to participate in the burglary.

John Sheridan, another acquaintance of Centers, testified that on the Friday preceding the commission of the crimes, he and Gary Huntington visited Centers at his apartment for the purpose of buying some marijuana. Defendant was present, and Huntington asked defendant whether he felt uncomfortable being in a predominantly Black neighborhood. Defendant responded by partially revealing a gun located beneath a sofa cushion.

On March 15, at approximately 8:30 a.m., the hostess at a Cameron Park restaurant observed defendant, Centers, and Handley enter the restaurant and approach the counter. A waitress testified that she served the three men at the counter. At approximately 11 a.m. that same day, Chester's neighbor observed a man resembling Centers walking down Cameron Road looking intently at the Chester residence. A white pickup truck approached, stopped, and the man climbed into the back of the truck.

ii.  *The commission of the crimes.*

Shortly before noon on March 15, Chester was home with his wife, Barbara Teater Chester. Mrs. Chester testified she heard her husband answer

a call coming from an intercom-telephone located outside the house, stating that he would be out shortly. After her husband proceeded to the garage, she heard him shout, "bullshit." Mrs. Chester peered outside a window and saw a white pickup truck parked in the driveway. She then heard other voices becoming loud and angry, the sound of bodies impacting against each other and a wall, and finally a loud "crack" and the splintering of wood. After hearing her husband say, "I'll take you to the safe," she heard another voice threaten, "Yes, you take me to the safe. You take me to the safe or I'll blow your fucking head off." Mrs. Chester testified that after listening to a tape recording of a March 23, 1982, conversation between defendant and Centers (see pt. I.A.iv., *post*), she recognized defendant's voice, particularly his expletive "fuckin'," as similar to the voice that had threatened her husband. The voice did not resemble that of Handley, nor did the accent resemble that of an African-American.[4] (Karen Langford, a neighbor, testified that shortly after the shooting, Mrs. Chester told her one of the voices she heard resembled that of a "colored man.")

Mrs. Chester retreated to the bathroom and escaped through a sliding glass door. Walking toward the front of the house, she heard a loud cracking noise, which jolted her. As she proceeded to walk forward, she observed the back of a Caucasian male approximately 30 feet away, near the front of the house, moving away from her. She testified that, in her opinion, there was insufficient time (between the cracking sound and her observation) for this man to have fled from the master bedroom (where her husband was shot) and reached his location outside the residence.

She further described the man as tall, approximately five feet, nine inches, to six feet in height, thin, with dark brown hair.[5] She testified the man resembled Centers and not defendant, whom she had seen for the first time at the preliminary hearing and who had grayish hair. Mrs. Chester recalled the man was wearing a dark green sweater. She also acknowledged that, at the preliminary hearing, she had been unable to identify either Centers or defendant as the man whom she had seen outside her residence.

Proceeding to the front door, Mrs. Chester found her keys and then fled in her automobile to the home of a friend, where she contacted the sheriff's office. En route, she noticed a person (apparently male) on Cameron Road,

---

[4]Defendant and Centers are Caucasian, and Handley is African-American.

[5]Defendant's probation report described him as five feet, nine inches in height, one hundred sixty-five pounds, having brown hair, and fifty-two years of age at the time of the commission of the crimes.

Centers's probation report described him as five feet, nine inches in height, one hundred forty pounds, having brown hair, and twenty-two years of age at the time of the commission of the crimes.

approximately 300 feet from the foot of her driveway, walking in the direction of her residence. He was thin, approximately five feet, nine inches, to six feet in height, with a tan and white scarf wrapped around his head, concealing his face.

Within minutes, El Dorado County Deputy Sheriff Thomas Hill arrived at the Chester house, finding a white pickup truck parked in the driveway. After Hill entered the garage, an interior door opened and a man wearing a maroon-colored jacket (later identified as Handley) appeared. After Deputy Hill yelled at Handley to halt, Handley quickly retreated into the house.

By this time, other deputies had arrived at the scene. Deputies Hill and Evan Sundby observed two men running from the far corner of the house. Deputy Hill testified that one of the men was Handley, and Deputy Sundby testified that one of the men was wearing a red shirt or jacket. Losing sight of one of the men, Deputy Hill pursued Handley in a northeasterly direction, through thickly vegetated, rugged terrain. On cross-examination, he acknowledged having testified at the preliminary hearing that the two fleeing men had been running together in the same direction.

Deputy Brown testified that he joined Deputy Hill in hot pursuit of one suspect and fired a warning shot, after which the suspect dropped into a crouching position. He further recalled the suspect was wearing a black coat, not a red- or maroon-colored coat.[6] The deputies then lost sight of the suspect and halted their pursuit.

Meanwhile, Deputy Sundby proceeded to the far corner of the residence from where the two men had fled, and observed an open sliding glass door. Upon entering, he found Chester, dead and handcuffed, on the floor of the master bedroom. The safe had not been opened, but the room had been ransacked. There was a .22-caliber gunshot wound to the back of Chester's head and another gunshot wound in his left arm.

Shortly thereafter, Handley was spotted by aircraft near a pond situated to the northeast of the Chester residence. Deputy Hill drove to that vicinity, walked to the pond, and saw Handley motioning to him with his hands. After Handley was taken into custody, the police found in his pockets a latex surgical glove, a golfer's glove, items taken from the Chester residence, and two $100 bills, the same denomination and number of bills that Mrs. Chester had seen in her husband's wallet the previous evening.

---

[6]At the time of his arrest, defendant was wearing a black windbreaker-type jacket. (See *post*, at p. 886.) Deputy Brown, however, indicated he and Deputy Hill were in pursuit of the same man.

Centers was apprehended within a half hour, while running through a field less than one mile from the Chester residence. He was wearing a red-maroon sweater-type shirt. Law enforcement officers undertook a roadway and aerial search of the area. Defendant was not located.

The white pickup truck parked in the driveway was registered in the name of Rita Neely, defendant's wife. Inside the truck, the deputies found a birth certificate, a bank statement, and a business card, all bearing defendant's name, a .30-caliber military rifle, a magazine with eight rounds, two knives, .12 gauge Remington shells, assorted tools, surgical gloves, a package of marijuana seeds, a notebook containing miscellaneous papers bearing handwriting later identified by an expert as that of defendant, and a tablet of paper on which the Chester address and telephone number had been written. The deputies also discovered in the truck a blue suitcase (later identified as belonging to defendant's wife), containing a clip for a .22-caliber High Standard automatic weapon, and a vest later identified as similar to one belonging to defendant. Also found was a package addressed to Mrs. Bruce Chester, containing old magazines, which, during closing argument, the prosecution argued had been a "trick" box to gain entrance to the Chester home.

Fingerprints matching those of defendant, Centers, and Handley were lifted from the pickup truck.

Two bullets were removed from a wall and a floor of the Chester residence. All of the bullets, including the one removed from the victim's head, were fired from the same .22-caliber weapon, a firearm having characteristics similar to those of a .22-caliber pistol manufactured by High Standard Firearms Company. This weapon resembles a Luger-style or Ruger-style firearm.

The afternoon of March 15, the sheriff's deputies, with Handley present, searched the area of the northeast corner of the residence for Handley's gun. Only a construction helmet later identified as belonging to Handley was found. On March 16, the deputies conducted an extensive but unsuccessful "grid" search for weapons in the vicinity of the path taken by at least one of the fleeing suspects. On March 19, members of a metal detector club assisted in a broader search with the aid of their equipment. In an area to the north of the location where Deputies Hill and Brown lost sight of the suspect, approximately four or five feet from the pavement of Cameron Road, a club member detected a metal object. With a screwdriver, she unearthed a .32-caliber gun buried approximately four to six inches underground. This witness testified that the ground bore no traces of having been disturbed or of an object having been buried.

Handley's girlfriend and his brother testified they recognized the .32-caliber firearm as belonging to Handley. The bullets recovered from the Chester residence and the victim's body could not have been fired from this gun. The murder weapon never was found.

On March 16, a pair of surgical gloves turned inside out (as if they had been pulled off the wearer's hands) was found in the general area of the path taken by Handley.

The victim's wife, Barbara, testified that her husband probably had been acquainted with Centers, but to her knowledge had not been acquainted with defendant.

### iii. *Defendant's arrest.*

In the early morning hours of March 16, a Cameron Park firefighter was awakened at a fire station by the sound of unidentified footsteps. The following morning, the firefighters at the station discovered items of clothing, including a baseball cap and a blue vest, missing from their vehicles. That same morning, a Cameron Park resident heard sounds coming from a nearby vacant house. After investigating, her husband found the house had been forcibly entered, and discovered inside a blue vest, later identified as belonging to one of the firefighters. Defendant's latent fingerprints were found within the house.

On March 18, between 9 and 10 in the evening, John Huntington drove into the driveway of his Cameron Park residence. Defendant appeared from behind the shrubbery and asked Huntington for a ride out of Cameron Park. Huntington immediately recognized him as one of the men being sought for the Chester murder. When defendant offered Huntington $50 for the ride, Huntington countered with a request for $100. After defendant replied that he would pay any sum, Huntington retreated inside, alerted his father, Frederick Huntington, and summoned the sheriff. His father held defendant at bay with a shotgun until two deputies from the sheriff's department arrived.

When taken into custody, defendant appeared haggard and unshaven. He was wearing a black windbreaker-type jacket and had $1,254 in his pocket. At trial, Mrs. Chester testified it was possible her husband had had a large amount of cash on his person on the morning of the crimes. She had found a copy of a cashier's check and a cancelled personal check (of Mrs. Chester's, payable to her husband), indicating that he had ca..ied these checks prior to March 15. She testified that her husband and Al Saulsbury,

who was purchasing a residence from the Chesters, might have been planning to deposit the cash at American Savings to cure a mortgage default.

Saulsbury testified that Chester had failed to apply moneys paid by Saulsbury to Chester toward the mortgage payments, and that Saulsbury had sought to cure the mortgage default.

iv.  *Tape recording of van conversation.*

On March 23, 1982, Deputy William Wilson of the El Dorado County Sheriff's Department, who was the chief investigating officer in the case, arranged for the activation of a concealed microphone and tape-recording device in the sheriff's van that was transporting defendant, Centers, and Handley from the jailhouse to the courthouse, in order to record any conversation among the three men. At the time of the recording, defendant had been charged with the crimes and counsel had been appointed for him. At trial, over an unsuccessful hearsay objection by defense counsel, the tape recording and a transcript of that recording were admitted into evidence, and a computer-enhanced version was played for the jury at the close of the prosecution's case-in-chief.

The transcript of the tape recording reflects that, at the outset of the conversation, defendant complained to Centers about John Huntington's having turned him in. Centers remarked that he had "buried" Gary Huntington by telling the authorities Centers had purchased "hot goods" from Gary, including stereos, and that Gary had "pick[ed] up the dope Friday night" from Centers's apartment. Centers asked whether defendant had read the newspaper, and defendant responded that he had. Defendant then suggested that they fabricate a false story regarding their involvement in the crimes, proposing to tell the authorities they had hired two men to intimidate Chester into returning some "dope" they had "fronted" him, and when these men failed to reappear, the three codefendants had entered Chester's home and found his body.

At this point in the conversation, Centers interjected: "Yeah. But I . . . I didn't even go into the house." (Ellipses in original.) Defendant replied, "I know," and then complained that "[Chester's] fuckin' old lady was in there all the time." Centers continued, apparently relating the substance of his interview with the authorities: "Man, they keep on askin' me where was I in the house. I say, 'Hey, man, I wasn't in that house. They just went up t[o],' you know, to get the money that was owed. And that's it, you know, as far as I know, to my knowledge. . . . And they wouldn't even believe me. They just kept on telling me, they says, 'Well, we talked to Handley and he told us this, this and this.' "

Eventually defendant remarked that the authorities would discover his gun: "They're going to find that fuckin' pistol, I'm sure." Centers inquired, "Well, where's it at," and again asked, "What'd you do with it." The following colloquy then ensued: "[DEFENDANT:] I threw it away. I didn't bury it or nothin'. . . . It's been rained on. It might rust a little bit before they find it. [¶] [CENTERS:] I don't think they'll even find it. They aren't (INAUDIBLE) give up the search. They found Handley's. [¶] [DEFENDANT:] Well, it says in the papers they're still looking for a .22. [¶] [CENTERS:] Handley had a .22 also. [DEFENDANT:] .22."

Defendant reiterated the need for a false story, " '[c]ause with it a robbery murder, we're just deader than a mother-fucker. We're going to do uh, life without possibility, some fuckin' thing, uh, get sixteen years out of the fuckin' thing. This way, all we did was hire them fuckers to go in and rough the guy up, they happen to kill him, and we burgle the house a little bit 'cause we . . . ." The voice of Handley (who at that point evidently was present) inquired of defendant, "Where your gun at?"; defendant replied, "My gun is still gone"; Handley said, "They found mine . . . ," and defendant replied, "Yeah."

Defendant ultimately warned his companions that, "if I go, you guys are gonna' go because you already admitted you're accomplices of mine."

B. *Defense case.*

Defense counsel sought to call Handley as a witness as part of the defense case. Pursuant to a plea agreement, Handley had testified at the preliminary hearing on behalf of the prosecution, but at trial he was not called as a prosecution witness.

Following the close of the prosecution's case, defense counsel informed the court that he intended to call Handley as a witness, and that he had been informed that Handley's attorney (Gregory Haas, who was present at the hearing) opposed his client's being called as a witness. Haas confirmed that, if called to testify, his client would invoke his Fifth Amendment privilege, and on this ground objected to Handley's being called as a witness. Outside the presence of the jury, Handley was called and sworn as a witness, at which point the trial court sustained his claim of privilege.

The defense then called Haas as a witness. Haas testified that Handley had testified for the prosecution at the preliminary hearing in exchange for certain "concessions" made by the prosecution.

Hans Stange testified that in 1981, in response to an advertisement placed in the newspaper by Chester, he "purchased" a note secured by a second

deed of trust, which encumbered a residence occupied by Al Saulsbury, and that at the time of Chester's death the note was in default.

Defendant's wife, Rita Neely, testified that defendant had not been home (in Laytonville) on March 12, and that when he arrived between 12 and 1 p.m. on March 13, he explained he had been in Sacramento. She testified that Laytonville is approximately three and one-half to four hours from Placerville. She left their home on March 14 to attend an art class at Mills College (in Oakland) scheduled for the following day.

Rita Neely recalled giving her husband $1,000 in cash in January 1982. Defendant had been laid off from work at that time and was receiving unemployment checks. On cross-examination, Rita testified that defendant owned two black "powder" guns and once had a handgun which, at her request, he had discarded. She identified the blue suitcase found inside the white pickup truck as hers and the vest it contained as defendant's. She corroborated, the testimony of the prosecution's expert by describing the handwriting on pieces of paper seized from the pickup truck as similar to her husband's.

Gary Huntington (who had testified for the prosecution at the preliminary hearing under a grant of immunity from drug-related charges) testified that on March 12, he met with Centers and defendant at Centers's apartment in Sacramento for the purpose of purchasing marijuana for his personal use. At that time, defendant lifted a gun from beneath a sofa cushion, but Huntington testified (contrary to some of his earlier statements) that he did not see the barrel of the weapon.

Centers's trial attorney, testified to a minor point regarding the physical custody of items of evidence. Joseph Berger, the defense investigator, testified regarding various photographs and measurements of the crime scene, and specifically that the distance between the Chester residence and the location where Centers was apprehended was approximately seven-tenths of a mile. He also testified that the dense vegetation, in the area between where the African-American suspect had fled and the location where the .32-caliber gun was unearthed, was impenetrable.

At the conclusion of the guilt phase, the jury found defendant guilty of first degree murder (on the theories of felony murder and premeditated murder), robbery, and burglary, found true a single special circumstance that defendant had committed the murder in the course of "a robbery/burglary," and also found true the firearm-use and prior-prison-term allegations.

## II.  SPECIAL CIRCUMSTANCE PHASE

The prosecution presented documentary evidence establishing that in 1957, pursuant to his plea of guilty, defendant was convicted in the Los

Angeles County Superior Court of first degree murder and sentenced to state prison. At the conclusion of this phase, the jury found true the prior-murder-conviction special-circumstance allegation.

## III. PENALTY PHASE

### A. *Prosecution's case-in-aggravation.*

Through the testimony of two retired police officers, the prosecution presented evidence of the prior murder committed by defendant. On December 27, 1956, defendant and an accomplice drove to a Safeway store in Los Angeles intending to commit a robbery. Wearing a mask and holding a .22-caliber revolver, defendant was removing money from the cash registers when a man struck defendant's head with a can. Defendant staggered, turned, and shot the man nearest him in the head, killing him. Defendant and his companion then fled. Following his arrest, defendant stated to the authorities that his gun had fired accidentally after someone hit him in the face.

The prosecution also presented evidence of a 1979 unadjudicated robbery of a Cameron Park restaurant. Fred Sanchez, the general manager of the restaurant at the time of the robbery, testified that a man holding a clipboard in his left hand entered his office and shoved a Luger-style firearm into his stomach, stating, "You have a wife and two kids . . . . If you want to see them alive, I want your money and right now." After ordering Sanchez to the vault room (indicating the robber's familiarity with the restaurant), the robber encountered a female employee and forced her to accompany them. At the vault, the robber ordered Sanchez to open a safe, remove the money, and place it in a laundry bag. When Sanchez attempted to look at the robber more closely, he was ordered not to turn around. The robber then handcuffed Sanchez and the employee to the safe and fled with the money, leaving behind the clipboard.

Following the robbery, the authorities obtained impressions of latent prints from a "SMUD" (local utility company) notice attached to the clipboard. In March 1982, an exemplar of defendant's left thumb print was found to match the prints lifted from the SMUD notice. Defendant's prints were not found on the clipboard or the handcuffs. Sanchez furnished the authorities with a description of the robber as having blond hair and a bushy mustache, and being between five feet, seven inches, and five feet, ten inches, in height, and between thirty and thirty-five years of age. A composite drawing of the suspect, prepared on the basis of the description provided by Sanchez, was admitted into evidence. At trial, Sanchez testified the

composite drawing resembled the robber, but he was not asked to, and did not, identify defendant as the perpetrator of the robbery.

At the conclusion of the prosecution's case in aggravation, defense counsel moved to strike the evidence of the restaurant robbery on the ground the evidence was insufficient to establish that defendant was involved in the robbery. The motion was denied.

### B. *Defense case-in-mitigation.*

The defense presented in mitigation the testimony of 12 witnesses, many of whom resided in the small community of Laytonville, where defendant and his wife had resided for 8 years.

William Bailey, a longtime Laytonville resident and the owner of a lumber business, had known defendant for eight years. Bailey had employed defendant in a number of capacities in his lumber business, lumber supply mail order business, and gas station. Defendant always was reliable and could be trusted with the handling of large amounts of cash. In January 1982, Bailey was forced to lay off defendant due to a decline in the lumber industry.

Bailey testified that, in addition to his regular employment, defendant was a regular participant in community events, frequently volunteering his time for local fund-raising activities. Defendant also pursued artistic endeavors, displaying his paintings at local fairs.

Bailey further testified he considered defendant a personal friend. Bailey was aware defendant had served a prison term for murder and robbery, but, in light of defendant's commitment to the community and his personality, defendant always had been welcome in Bailey's home.

John Weed was the owner, publisher, and editor of the Laytonville local newspaper. He testified he had worked with defendant approximately five months in the lumber business, describing him as a reliable and industrious worker. Defendant often volunteered his time for community activities and, in Weed's opinion, was an asset to the community. Weed had been aware of defendant's criminal history, which had not deterred him from welcoming defendant into his home. Weed also was familiar with defendant's artwork which, in Weed's opinion, was of high quality.

Another Laytonville resident testified he had known defendant for several years and considered him a close friend. After seeing defendant's artwork, he helped defendant sell some of his paintings in Los Angeles. Other

residents described defendant as a member of the community whom they respected and trusted. He volunteered his time to the school district, working on a weekly basis to help fourth graders with art projects. A kindergarten teacher testified that defendant was gentle, kind, and had a "knack" with children.

Two correctional department guards who worked at the facility where defendant had been incarcerated testified that he had been a good inmate and never a discipline problem.

Rita Neely, defendant's wife, testified that during their eight years of marriage, defendant had been a good husband and father to her five children and had participated actively in their upbringing. After defendant was laid off from work in January 1982, he began selling marijuana, an activity that had distressed her. Defendant's stepson, a member of the Coast Guard, testified that he considered defendant a close friend and a loving father to his younger siblings.

Brief portions of Handley's preliminary hearing testimony (that were inconsistent with the physical evidence) were read into the record, tending to impeach the credibility of Handley's testimony at that hearing.

During their penalty phase deliberations, the jury sent a note to the court, inquiring: "On this page the instructions state, 'If you conclude that the aggravating circumstances————you *shall* impose a sentence of death.' Does this mean we *have* to, or see pg 22 [the instructions concerning sympathy and mercy]." The jury attached another note to page 22 of the instructions, inquiring: "May we show mercy and give life without possibility even though we feel aggravating outweighs mitigating?"

In response to these notes, over defense counsel's unsuccessful objection, the trial court instructed the jury as set forth in the margin below.[7]

After receiving this instruction, the jury resumed its deliberations and returned a verdict imposing the punishment of death.

---

[7]"I will answer that question as follows: I am going to now direct your attention to page 17 of those instructions, which has been previously read to you, which you now have with you in the Jury Room. [¶] That page reads as follows: (Reading) 'It is now your duty to determine which of the two penalties, death or confinement in the State Prison for life without possibility of parole, shall be imposed upon Defendant. [¶] After having heard all the evidence, and after having heard and considered the arguments of Counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without possibility of parole . . . .' [¶] Page 22 of the Jury Instructions, which you sent

## IV. GUILT PHASE ISSUES

### A. *Admission of tape recording of van conversation.*

At the preliminary hearing, Deputy Wilson testified that, following petitioner's arrest, the three codefendants were kept in separate cells to prevent them from discussing the crimes or the investigation. In arranging for the transportation on March 23, 1982, of the three codefendants in the sheriff's van fitted with the concealed tape recording device, Wilson anticipated that the three men would take this opportunity to discuss their involvement in the crimes. During his testimony on direct examination, Wilson further testified: "[Prosecutor:] At any time did you make any suggestion whatsoever to either Mr. Handley or to Mr. Centers that you wanted them to try and get information from their fellow participants in the alleged crime? [¶] [Wilson:] No, sir." Defendant's counsel, joined by Centers's counsel, moved for suppression of the tape recording on the ground this evidence had been obtained in violation of his right to privacy as defined by our decision in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]. The court denied the motion.

Thereafter, prior to trial, Centers's trial counsel and defendant's counsel (again relying upon *De Lancie*) moved separately for suppression of the tape recording. During cross-examination of Deputy Wilson at the evidentiary hearing on Centers's motion, Wilson testified as follows: "[Counsel:] On the 15th [of March] and prior to the taping [of the March 15 interview], did you make any promises to Malcolm or any representations to Malcolm about what the outcome of your investigation would be? [¶] [Wilson:] No sir. [¶] [Counsel:] Did you talk to Malcolm at all? Did you make any representations to him about whether or not things would go hard or easy on him if he cooperated? [¶] [Wilson:] No, sir. [¶] [Counsel:] Did you make any statement like that on the 22nd? [¶] [Wilson:] No, sir." At this same hearing, Deputy Erol Harnage, who had assisted Wilson in the investigation and participated in the interrogation of Centers, testified that, to his knowledge, no promises ever had been made to Centers in exchange for his cooperation with the authorities.

At the evidentiary hearing on defendant's motion to suppress the tape recording, Deputy Wilson testified he had arranged for the installation of the tape-recording device for public safety purposes, in light of evidence indicating the possibility there had been a fourth participant in the crimes.

---

back to me, allows the Jury to consider pity, sympathy and mercy as those factors may constitute a mitigating circumstance within the Defendant's background. The language should not be interpreted as providing anything contrary to page 17 of your Instructions."

District Attorney Tepper testified that he had approved the tape recording for the purpose of obtaining additional incriminating evidence supporting the prosecution's case. The trial court denied both motions to suppress, concluding that Wilson's testimony established there was a legitimate reason justifying the tape recording, and that, accordingly, the evidence was not inadmissible under the *De Lancie* decision (*supra*, 31 Cal.3d 865).

At trial, following the testimony of the victim's wife, Barbara Chester, defense counsel renewed his motion for suppression of the tape recording, in light of the witness's testimony indicating there never had been any suspicion of a fourth participant in the crimes. The motion again was denied.

In establishing a foundation for the admission of the tape recording, the prosecution called Deputy Harnage, who testified that, prior to March 23, he had several lengthy conversations with both Centers and Handley concerning the case. He further testified that neither he nor (to his knowledge) any other law enforcement officer had asked Centers or Handley to act in the capacity of an agent for the authorities. Deputy Wilson testified he had no personal knowledge of either Centers's or Handley's having been advised prior to the March 23 van conversation that their conversation would be tape-recorded surreptitiously.[8]

Defense counsel then objected to the admission of the tape recording on the ground it constituted inadmissible hearsay, but the trial court overruled

---

[8]During cross-examination of Wilson, defense counsel inquired, "Sir, on the 23rd and prior thereto was Mr. Handley cooperating with you and law enforcement?" The prosecution objected on the ground of irrelevance, arguing that the only relevant issue was whether Centers or Handley had been aware that their conversation was being recorded—a circumstance that, in the prosecution's view, would support the inference they "might attempt to slant or state their statements in a way . . . ." The court stated that it agreed with the prosecutor that "the preliminary question is too broad and does become irrelevant . . . ," that defense counsel could "inquire into circumstances which would relate to their possible cooperation with law enforcement . . . ," but that "[t]he only thing we're concerned with is whether or not they had knowledge of the fact that they were being monitored. . . . [ ] [T]his is where the question of relevance comes in. The mere fact that they may have cooperated with the law enforcement officers is no evidence that they had knowledge of the tape, and that's the only question that we're concerned about is knowledge of the tape." Defense counsel responded that, based upon evidence of a cooperative relationship between the two codefendants and law enforcement, the inference could be drawn that Handley and Centers were aware the conversation was being recorded. The court rejected this argument, however, stating "the mere fact they may have been cooperating with the police would not in any way serve to give them knowledge of the fact that their conversations were going to be surreptitiously recorded, and I can't make that bridge logically." The court sustained the prosecutor's objection to defense counsel's question, ruling that "it doesn't matter to this case whether they were cooperating with the police insofar as the issue of knowledge of their recording, which I believe is the only issue that's been considered [ ]."

Significantly, defense counsel did *not* argue that evidence of Centers's relationship with the El Dorado County Sheriff's office was relevant to establish error under *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] (*Massiah*).

the objection, concluding the tape recording and transcript were admissible under exceptions to the hearsay rule.

On appeal, defendant asserts that the tape recording of the March 23 van conversation constituted inadmissible hearsay and that, for this reason, among others, the admission of the tape recording and transcript constituted prejudicial error.

Following completion of the initial briefing on appeal, defendant's appellate counsel filed a petition for writ of habeas corpus, seeking relief from the judgment on numerous grounds, including ineffective assistance of counsel. The petition alleged, among other claims, that the tape recording and transcript were inadmissible under *Massiah, supra,* 377 U.S. at page 206 [12 L.Ed.2d at page 250], and its progeny, and that defendant was deprived of competent representation by trial counsel in several respects, including counsel's failure to investigate adequately Centers's role as a government agent in the recorded conversation, and to assert an objection on *Massiah* grounds to the admission of the tape recording and transcript. Concluding the petition stated a prima facie case, we issued an order directing the Attorney General to show cause why the relief prayed for in the petition should not be granted.

The petition, the return, and the traverse, with supporting declarations and memoranda of points and authorities, established, with respect to the tape recording, that there were disputed factual issues relating to whether Centers had acted as an agent of law enforcement during the conversation that took place among the three codefendants in the van, and whether trial counsel's failure to object to the tape recording and transcript on *Massiah* grounds constituted deficient performance. We issued a reference order, directing a referee to take evidence and make findings of fact on these issues. The evidentiary hearing has been completed, and the referee has filed his findings of fact with this court.

For the reasons set forth in the accompanying opinion in the habeas corpus proceeding, we have concluded that the tape recording of the van conversation, as well as the transcript, were inadmissible under *Massiah, supra,* 377 U.S. 201, and its progeny; that counsel's failure to object to this evidence on *Massiah* grounds was the result of inadequate investigation rather than an informed tactical decision; and, accordingly, that counsel's omission constituted deficient performance. We have concluded further that such deficient performance was prejudicial to petitioner at the guilt phase, and that this error requires that the judgment be set aside in its entirety. (*In re Neely, supra, post,* at p. 922.)

In light of the disposition of the habeas corpus proceeding, there is no need to resolve most of the claims raised in the briefs on appeal. For the guidance of the parties and the trial court in the event of a retrial, however, we shall address several issues, raised on appeal, that are likely to recur on retrial.

### B.  *Admission of gun and ammunition; evidence of subsequent crimes.*

■  Defendant contends he was deprived of effective representation because of his counsel's failure to object to the admission of the .30-caliber rifle and the ammunition found inside the pickup truck parked at the crime scene. He asserts that, because the rifle was not the murder weapon and neither the rifle nor the ammunition was relevant to any issue relating to the commission of the crimes, this evidence was far more prejudicial than probative of any material issue, and for that reason would have been excluded had defense counsel made a proper objection. In support of his claim, defendant cites *People* v. *Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1]. In *Riser*, this court held that admission of evidence of weapons, other than the murder weapon, discovered in the defendant's possession at the time of his arrest, several weeks following his commission of the murder, was error. The court stated: "When the prosecution relies . . . on a specific type of weapon [as the murder weapon], it is error to admit evidence that other weapons were found in [defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Ibid.*)

In the present case, admission of the gun and the ammunition was not prohibited by the rule stated in *Riser*. Under circumstances unlike those present in *Riser*, the weapon and the ammunition located in defendant's truck were found by deputy sheriffs at the crime scene, shortly after commission of the crimes, and there was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses. For these reasons, defendant has failed to establish that the challenged evidence was inadmissible under *Riser*.

■  Defendant also characterizes as incompetent his attorney's failure to object to evidence of his activities following the commission of the crimes, including his theft of items of clothing from the firefighters' vehicles, and his illegal entry into the vacant residence in Cameron Park. He contends that this evidence was more prejudicial than probative of any disputed material issue, and that counsel's failure to object to its admission pursuant to Evidence Code section 352 deprived him of competent representation.

Again, defendant fails to show the evidence was not properly admissible. Evidence of defendant's whereabouts before his arrest and during the three-day period following commission of the crimes, indicating he was "in flight"

and avoiding apprehension, was highly probative of his participation in the crimes and of his consciousness of guilt (see *People* v. *Perry* (1972) 7 Cal.3d 756, 780-781 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Hall* (1926) 199 Cal. 451, 460 [249 P. 859]), and thus was admissible under Evidence Code section 1101, subdivision (b), for these purposes. Because this evidence was neither inflammatory, nor misleading with respect to any other issue, the record fails to demonstrate that an objection on the grounds now suggested would have been successful.

### C. *Claim of instructional error on lesser included offenses.*

The jury was instructed on first degree murder based upon two separate theories—felony murder and premeditated murder—and returned a verdict finding defendant guilty of first degree murder based independently upon each theory. ■ Defendant contends the trial court erred in rejecting his requested instructions on second degree murder and voluntary manslaughter as lesser included offenses of premeditated first degree murder.

We disagree. The evidence established that Chester was killed either by defendant or by one of his accomplices in the course of a burglary or a robbery (the prosecution's theory)—or by Handley, Centers, or some other third party (the theory of the defense). The record contains no substantial evidence that would have supported defendant's conviction of second degree murder or voluntary manslaughter. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 211 [279 Cal.Rptr. 720, 807 P.2d 949].) Thus, the omission of these instructions did not constitute error.

### D. *Special verdict form.*

■ Four separate verdict forms were submitted to the jury as to the offense of first degree murder, respectively specifying the following findings: (1) guilty under a deliberate, premeditated murder theory, (2) guilty under a felony-murder theory, (3) guilty under both theories, and (4) not guilty. The jury returned a verdict finding defendant guilty under both theories of first degree murder. Defendant contends the verdict forms provided for a "special verdict" under section 1152, rather than a general verdict under section 1151, and that the rendering of a special verdict in this case was violative of section 1150 and his constitutional rights to a jury trial and to due process of law.

Defendant's contention lacks merit. The Penal Code provides that a jury in a criminal trial must, except in enumerated circumstances, deliver a general verdict. (§ 1150.) "A general verdict upon a plea of not guilty is

either 'guilty' or 'not guilty,' which imports a conviction or acquittal of the offense charged in the accusatory pleading." (§ 1151.) "A special verdict is that by which the jury find the facts only, leaving the judgment to the Court." (§ 1152.)

In the present case, the verdict forms submitted to the jury provided for a hybrid form of general verdict, specifying a finding of guilty or not guilty of the offense of first degree murder under a felony-murder theory and a premeditated murder theory, both theories having been alleged in the information. The verdicts reflect a conviction of this offense under both theories. The verdict rendered by the jury, however, was not a special verdict; it did not present only findings of fact. Our decisions have upheld the validity of verdicts similiar in form to those returned in this case. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 920 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Burgener* (1986) 41 Cal.3d 505, 537-538 [224 Cal.Rptr. 112, 714 P.2d 1251].) We therefore reject defendant's claim of error in the submission of the verdict forms.

### E. *Instruction on felony-murder special circumstance.*

■ Defendant asserts the trial court, in instructing the jury as to the felony-murder special circumstance, improperly failed to include, among the required findings, the finding that defendant—if not the actual perpetrator, but solely an aider and abettor—harbored the requisite intent to kill.[9]

The instructions given, however, properly required that the jury find that defendant, if he was only an aider and abettor, had the intent to kill.[10] (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 954 [4 Cal.Rptr.2d 765, 824 P.2d 571].)[11] Accordingly, we find no error.

---

[9]The crimes in the present case were committed prior to this court's decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; accordingly, the trial court did not err in failing to instruct the jury that, even if they found defendant was the actual perpetrator of the murder, they must find that he harbored an intent to kill in order to find true the felony-murder special circumstance. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 143, fn. 5 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

[10]We note that, as amended by the initiative measure designated on the ballot as Proposition 115, adopted on June 5, 1990, section 190.2 now provides the felony-murder special circumstance is applicable to "every person not the actual killer, who, with *reckless indifference to human life and as a major participant*, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of [a designated] felony . . . ." (§ 190.2, subd. (d), italics added.)

[11]The introductory special-circumstance instructions included the following: "If defendant . . . was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted

## F. *Prior murder special circumstance.*

Defendant asserts that the trial court erred in failing to instruct the jury that intent to kill was an element of the prior-murder-conviction special circumstance (§ 190.2, subd. (a)(2)). Defendant's claim has no merit. Subsequent to the initial briefing that raised this point, we decided *People* v. *Hendricks* (1987) 43 Cal.3d 584, 596 [238 Cal.Rptr. 66, 737 P.2d 1350], which directly rejects the contention that section 190.2, subdivision (a)(2), requires a finding of intent to kill.

■ Defendant also asserts that the prior-murder-conviction special circumstance is inapplicable where the defendant is convicted of first degree murder on an aiding and abetting theory, because that special circumstance is not among those enumerated in section 190.2, subdivision (b) (listing special circumstances applicable regardless whether the defendant was the actual killer or merely an aider and abettor). This claim lacks merit. The prior-murder-conviction special circumstance is absent from the special circumstances listed under section 190.2, subdivision (b), because "section 190.2(b) lays down a special rule for a certain class of first degree murderers: if the defendant is guilty as an aider and abettor, he must be proved to have acted with intent to kill before any special circumstance (*with the exception of a prior murder conviction*) can be found true." (*People* v. *Anderson, supra,* 43 Cal.3d 1104, 1142, italics added.) Thus, section 190.2, subdivision (b), simply provides that, when a defendant is convicted of first degree murder on an aiding and abetting theory, the special circumstances listed in that subdivision may be found true only if the defendant acted with the intent to kill. Contrary to defendant's assertion, section 190.2, subdivision (b), does not preclude a prior-murder-conviction special circumstance when the defendant is found guilty of murder only as an aider and abettor.

### DISPOSITION

As noted, in the companion habeas corpus proceeding (*In re Neely, supra, post,* p. 922) we have concluded that the underlying judgment must be vacated in its entirety on the ground of ineffective assistance of counsel. Accordingly, the appeal is moot and is ordered dismissed.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I concur in the judgment: the appeal is moot and should be dismissed.

the actual killer in the commission of the murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant . . . ."

That being the result, I see no necessity for the lengthy advisory opinion and I do not join therein.

Kennard, J., concurred.