Filed 5/13/25  P. v. Nielson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD ANTHONY NIELSON,<br><br>    Defendant and Appellant. | C099247<br><br>(Super. Ct. No. STK-CR-FE-2021-0005654) |

Defendant Richard Anthony Nielson murdered his father by means of a single gunshot to the head.  He then wrapped the body in a rug and garbage bag, moved it to the back porch, covered it with a tarp, and fled to Mexico.  A jury convicted defendant of premeditated first degree murder and also found that he personally discharged a firearm causing death.  The trial court sentenced him to serve an aggregate indeterminate prison term of 50 years to life.

Defendant now contends (1) the evidence is insufficient to support his first degree murder conviction, (2) the trial court should not have admitted evidence that he violated his misdemeanor probation by leaving the country, and (3) defendant's trial counsel was ineffective in failing to object to the admission of a 911 call made by defendant's brother.

1

We conclude (1) the evidence of planning, motive, and manner of killing adequately supports the jury's finding that defendant made a deliberate and premeditated decision to murder his father; (2) the trial court did not abuse its discretion in allowing testimony that defendant was on misdemeanor probation when he fled the country, because the evidence was relevant to consciousness of guilt and its probative value was not substantially outweighed by the danger of undue prejudice or any other counterweight to admissibility; and (3) defense counsel's decision not to object to the 911 call did not fall below an objective standard of reasonableness, because although the challenged portion of the call contained two levels of hearsay, each fell within an exception to the hearsay rule.

We will affirm the judgment.

BACKGROUND

Defendant was molested when he was a child. In May 2021, about a week before the murder, defendant found out that his father, Roger Nielson, knew about the molestation when it was happening. Defendant felt betrayed. At the time defendant made the discovery, he was living with his father in Lodi. The father had difficulty walking and sometimes used a wheelchair. Defendant helped him with errands and also took care of the property.

Defendant's mother lived in Penn Valley with her husband and two other children, including defendant's half-brother Phillip. Defendant's mother testified that defendant called her from Mexico on May 23, 2021. He said he drove there. Two days later, defendant called her again and asked for money, which she sent. She also rented him a hotel room in Puerto Vallarta. Defendant's mother claimed she did not know why he was in Mexico. Being there violated defendant's terms of probation in a prior misdemeanor case.

On May 27, 2021, defendant again called his mother from Mexico, using a social media platform's video call feature. Phillip could hear the conversation because their

2

mother's phone was on speaker. Phillip listened to the first five minutes of the call before going outside to smoke cigarettes. What he heard made him "nervous, panicked." Twenty to 30 minutes later, while still in a state of panic, Phillip called 911 and told the dispatcher about the video call, specifically stating: "He told my mom that he killed his father." During Phillip's trial testimony, he admitted making that statement to the dispatcher, but denied that defendant said those words. Phillip testified that defendant was speaking with "pressured speech" and appeared "very manic." According to Phillip, defendant said he could not tell his mother what happened because people were listening. Defendant then started to spell out a name, "an 'R' and an 'O,' " but "stopped and said, 'They are still listening to me, they are following me.' " Based on that, Phillip assumed something might have happened to defendant's father, whose first name was Roger. So Phillip called 911 to have law enforcement do a welfare check on defendant's father.

That afternoon, San Joaquin County Sheriff's deputies arrived at the father's house to check on his welfare. One of the deputies testified that he could smell "the odor of a dead body" from across the street. The father's body was found on the back patio, wrapped in a rug and large garbage bag and covered by a tarp. Inside the house, deputies saw no signs of forced entry. There were also no signs of a burglary or robbery. A box of garbage bags was found in the kitchen area. Blood spatter was found on the floor and wall in the same area. A trash can containing an empty box of 9-millimeter ammunition manufactured by Federal was found outside the house.

After the body was discovered, a detective called Phillip to obtain a more detailed statement. The detective also spoke with defendant's mother. A portion of the phone call was played for the jury, in which defendant's mother appeared to say "he hurt him" and "he had him at the house." However, during her trial testimony, defendant's mother denied saying defendant hurt his father, instead claiming she said, "he *heard* him," meaning that defendant heard his father admit knowing about the prior molestation. She further claimed that "he had him at the house" did not refer to defendant having his father

3

at the house, but rather that defendant's father had defendant's molester at the house even though he knew about the molestation.

An autopsy conducted the next day revealed that the father was killed by a single gunshot wound to the head. The bullet entered the left temple and exited the right temple. The time of death was estimated to have been between two and eight days earlier, sometime between May 20 and 26.

After determining the cause of death, detectives returned to the crime scene to search for further evidence. Two 9-millimeter shell casings were located in the dining room. These casings were stamped with "FC," indicating they were manufactured by the same company that made the box of ammunition found in the trash outside the house. A bullet hole was found in a dining room wall. A single 9-millimeter bullet was retrieved from inside the wall. In the backyard, detectives found a refrigerator or freezer that had a few inches of water inside, and submerged in the water were two laptops and a cell phone. The cell phone and one of the laptops appeared to have been burned before it was submerged in the water.

On June 8, 2021, defendant's car was located in San Ysidro and towed to a secure police lot. The same day, defendant was arrested in Guadalajara, Mexico, and deported to San Diego. A search of defendant's car revealed an empty .40-caliber magazine hidden under the hood beneath the air intake filter. Defendant was transported from San Diego to San Joaquin County the next day.

About two weeks later, one of the father's friends was cleaning up the property and found a Crown Royal bag containing 38 live bullets inside a truck defendant had last driven. The friend gave the bag to law enforcement. The bullets in the bag were the same brand and caliber as the shell casings found inside the house. In a search of the truck, law enforcement found in the center console a prescription receipt in defendant's name with his date of birth.

4

A forensic analysis of cell phone and social media data revealed that the last outgoing call from the father's cell phone was made on May 22, 2021, at 6:17 p.m. At 7:47 p.m., defendant called his mother, who called him back a minute later. At 4:21 a.m. the next morning, the father's cell phone stopped connecting to the network, indicating that the phone was either turned off or damaged. At the time the father's phone stopped connecting, defendant's phone was connected to the network and was located at or near the father's house. Defendant's phone stopped connecting to the network from about 7 a.m. to about 1 p.m., after which it connected to cell sites in Los Angeles and San Diego. That afternoon, defendant and his mother connected a few times over video call, but calls to his cell phone went to voicemail. Defendant's mother and her husband also made several calls to the father's phone, which went to voicemail. At about 10:30 p.m., Phillip sent a text message to his mother telling her to wake him up if she heard from defendant. She responded: "I'm not gonna hear from him tonight he said he had a hotel and he was getting a prepaid phone tomorrow."

The prosecution also adduced evidence of two prior incidents of violence between defendant and the father. One of those incidents, occurring in 2019, involved physical injuries to the father and resulted in defendant's arrest for battery and making a criminal threat. The other incident, occurring the same month as the murder, involved defendant and the father yelling at each other and defendant shoving his father. Even after defendant's arrest for murdering his father, he referred to his father as "fuck face" when talking to his mother about the case, specifically saying he should have gone to her house instead of going to "fuck face's house."

## DISCUSSION

### I

Defendant contends the evidence is insufficient to support his first degree murder conviction.

"In reviewing a criminal conviction challenged as lacking evidentiary support, the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. An appellate court must accept logical inferences the jury might have drawn from the evidence, even if the court would have concluded otherwise. [Citation.] ' "The standard of review is the same when the prosecution relies mainly on circumstantial evidence." ' [Citation.]" (*People v. Brady* (2010) 50 Cal.4th 547, 561.)

Defendant was convicted of first degree murder on a premeditation theory. He does not challenge the sufficiency of the evidence supporting the jury's finding that he murdered his father with an intent to kill. Instead, he argues the evidence does not support the jury's additional finding that the murder was premeditated and deliberate. "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)

Stated simply, " '[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of

6

premeditation and deliberation.' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 118-119.)

Here, the prosecution presented strong evidence of defendant's preexisting motive to murder his father. Defendant was molested as a child and discovered that his father knew about the abuse when it was happening. Defendant made this discovery about a week before the murder and felt betrayed. In addition to this specific motive, i.e., to exact revenge for the father's betrayal, the two had a violent and acrimonious relationship before defendant's discovery, as evidenced by prior incidents of violence. Defendant referred to his father as "fuck face," even after he was arrested for the murder.

As for evidence of planning activity, the jury could have reasonably inferred that defendant brought a loaded 9-millimeter handgun into the house prior to the murder. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought a loaded handgun . . . indicating he had considered the possibility of a violent encounter"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [bringing the fatal knife into the victim's home supported a reasonable inference that the defendant considered the possibility of murder beforehand].)

The manner of killing also supported a finding of premeditation and deliberation. The father was killed by a single gunshot to the head, "indicative of a deliberate intent to kill." (*Koontz, supra*, 27 Cal.4th at p. 1082.) Viewed together, the evidence adequately supports the jury's finding that defendant made a deliberate and premeditated decision to murder his father.

Relying primarily on *People v. Wear* (2020) 44 Cal.App.5th 1007, defendant nevertheless argues there was no evidence of planning activity in this case. But *Wear* is inapposite. In that case, the defendant and a friend went to meet an acquaintance (the victim) to either buy or steal a gun from him. An argument ensued. The victim, who had two guns, shot the defendant's friend. The defendant then took that gun, shot the victim twice in the head, and fled with the other gun. (*Wear*, at p. 1009.) The appellate court

concluded the evidence was insufficient to support a finding that the murder was deliberate and premeditated. The court explained that "the lack of evidence of planning, weak evidence of motive, and absence of any other evidence suggesting premeditation and deliberation, combined with the strong evidence that [the defendant] impulsively shot [the victim] after [the victim] shot [the defendant's friend], leads us to conclude that insufficient evidence supports a verdict of premeditated murder." (*Id*. at p. 1032.) Thus, in *Wear* the evidence was insufficient in many ways. Whereas here, as we have explained, there is strong evidence of preexisting motive, the manner of killing supports a finding of premeditation, and there is even evidence of planning: bringing a loaded gun to the house. This case also differs from *Wear* in that there is no evidence the shooting was rash and impulsive.

Next relying on *People v. Boatman* (2013) 221 Cal.App.4th 1253, defendant argues his motive did not "support an inference that the killing was the result of pre-existing reflection and careful thought and weighing of considerations." But *Boatman* is also distinguishable. In that case, the motive evidence involved text messages from the victim (defendant's girlfriend), suggesting the defendant was in a bad mood or angry with her, which the court characterized as "weak evidence of a motive suggesting premeditation and deliberation." (*Id*. at pp. 1267-1268.) Here, defendant's feelings of betrayal arising from the fact that his father knew he was being molested when that abuse was occurring is strong evidence of the type of motive that suggests premeditation and deliberation.

Finally, defendant distinguishes this case from a number of cases in which the manner of killing, i.e., "an execution-style murder," provided very strong evidence of premeditation. (*People v. Hawkins* (1995) 10 Cal.4th 920, 956, overruled on another point in *People v. Lasko* (2000) 23 Cal.4th 101, 110; see also *People v. Bloyd* (1987) 43 Cal.3d 333, 348.) Here, however, defendant murdered his father, who had difficulty walking and sometimes used a wheelchair, by shooting him in the head. Although not

necessarily an execution-style killing, the manner of killing is "indicative of a deliberate intent to kill." (*Koontz, supra*, 27 Cal.4th at p. 1082.)

## II

Defendant next claims the trial court should not have admitted evidence that he violated his grant of misdemeanor probation by leaving the country.

The prosecution sought to admit evidence, in the form of a probation officer's testimony, that defendant was in violation of probation when he fled to Mexico following the murder. The prosecution argued the evidence was relevant to establish consciousness of guilt. Defense counsel objected, asserting that "whether he's on probation and whether or not he's in violation of probation" was not "probative of any material fact that is before the Court." The trial court agreed with the prosecution that the proffered evidence was relevant to consciousness of guilt, but asked for argument as to whether "its probative value [was] outweighed by its prejudicial effect." The prosecution argued that fleeing the country in violation of probation was "very probative" of consciousness of guilt and not unduly prejudicial because "why he's on probation or any of the underlying facts" could be kept from the jury. The trial court ruled the evidence was admissible, but directed that the prosecutor and the probation officer must refer to defendant's probation as "misdemeanor probation" and must not divulge underlying facts.

The subsequent testimony complied with the ruling. The probation officer testified that she was supervising defendant on a grant of misdemeanor probation. He was required to check in with her on a weekly basis. His last check-in was May 19, 2021. Defendant was not allowed to leave the state without permission, and he did not seek any such permission.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)[1] Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) One statute providing for the exclusion of relevant evidence is section 1101. " 'Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including . . . specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1373.) Section 352 also provides for the exclusion of otherwise admissible evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) That provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see *People v. Tran* (2011) 51 Cal.4th 1040, 1047.) We review the trial court's decision to admit evidence under those provisions for abuse of discretion. (*People v. Gray* (2005) 37 Cal.4th 168, 204 (*Gray*).)

Here, as in *People v. Neely* (1993) 6 Cal.4th 877, "[e]vidence of defendant's whereabouts before his arrest and during the . . . period following commission of the crimes, indicating he was 'in flight' and avoiding apprehension, was highly probative of

---

[1] Undesignated statutory references are to the Evidence Code.

10

his participation in the crimes and of his consciousness of guilt [citations], and thus was admissible under . . . section 1101, subdivision (b), for these purposes." (*Id*. at pp. 896-897.)  The fact that defendant was willing to violate his probation in order to flee the country was especially relevant to defendant's consciousness of guilt.  And although there was a danger that the jury might speculate as to the reason for defendant's probation, any such danger was mitigated by the trial court's requirement that the jury be informed it was misdemeanor probation.  The trial court did not abuse its discretion in determining that the danger of undue prejudice did not substantially outweigh the considerable probative value of the evidence.  With respect to the other statutory counterweights found in section 352, the evidence did not consume an undue amount of time or present any danger of confusing the issues or misleading the jury.  There was no abuse of discretion.

## III

In addition, defendant asserts his trial counsel provided ineffective assistance by failing to object to the admission of a 911 call made by defendant's brother.

In the relevant portion of the 911 call, the brother stated:  "He told my mom that he killed his father."  The prosecution sought to admit the call under the following exceptions to the hearsay rule:  as an admission by a party opponent (§ 1220), as a spontaneous statement (§ 1240), and as a prior inconsistent statement (§ 1231).  At the hearing on in limine motions, defense counsel indicated she would be willing to stipulate to admission of the call, agreeing the statement met the Evidence Code sections the People had cited.  After further discussion, the trial court deferred ruling on admissibility.

At a subsequent hearing, the trial court precluded the prosecutor from playing the call during his opening statement, but indicated the call might come in during trial depending on Phillip's testimony.  Defense counsel offered no comment at that point.  When the call was admitted into evidence during Phillip's testimony, defense counsel did not object.

11

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citation.] 'Failure to object rarely constitutes constitutionally ineffective legal representation.' [Citation.]" (*Gray*, *supra*, 37 Cal.4th at pp. 206-207.)

Defendant argues his trial counsel's failure to object to his brother's 911 call fell below an objective standard of reasonableness because the call included "impermissible hearsay to which no exception applied." We disagree.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally inadmissible. [Citation.] But there are a number of exceptions to this rule." (*People v. Flinner* (2020) 10 Cal.5th 686, 735.) The 911 call contains two levels of hearsay. The first is Phillip's statement to the dispatcher that defendant said he killed his father. The second is defendant's statement to his mother admitting that he killed his father. "Multiple hearsay may not be admitted unless there is an exception for each level." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)

Defendant's statement to his mother (essentially, "I killed my father") was offered for the truth of the matter asserted, but it is covered by the party-admission exception to

12

the hearsay rule. Section 1220 provides an exception to the hearsay rule for evidence of a statement that is "offered against the declarant in an action to which he is a party . . . ." Here, "defendant was the declarant, the statement[ was] offered against him, and he was a party to the action." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.)

Turning to Phillip's statement ("He told my mom that he killed his father"), this was also offered for the truth of the matter asserted, i.e., that defendant confessed to killing his father. As mentioned, the prosecution proffered two exceptions to the hearsay rule in this regard, but we need not address both of them, because a reasonable trial counsel could have concluded that the spontaneous statement exception applied to Phillip's statement.

Section 1240 provides an exception to the hearsay rule for evidence of a statement that "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." The exception has the following elements: " ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been made before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it." ' [Citation.]" (*People v. Lozano* (2024) 101 Cal.App.5th 366, 376 (*Lozano*).)

Phillip testified that he listened to the first five minutes of the video call between defendant and his mother before going outside to smoke cigarettes because what he heard defendant say during the call made him "nervous, panicked." Twenty to 30 minutes later, while still in a state of panic, Phillip called 911 and told the dispatcher what defendant said during the call, i.e., that he killed his father. The first and third elements are easily met. The occurrence that caused nervous excitement in Phillip was overhearing

13

defendant's statement about killing his father and Phillip told the dispatcher about overhearing that statement.

We conclude the remaining element—continued influence of nervous excitement—was also met. Although 20 to 30 minutes elapsed before Phillip called 911, "[t]he mere passage of time does not necessarily render a statement inadmissible under the exception for spontaneous statements." (*Lozano, supra*, 101 Cal.App.5th at p. 377.) Instead, "[t]he ' "crucial element" ' . . . is ' "the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." ' [Citation.]" (*Id*. at p. 376.)

For example, in *People v. Clark* (2011) 52 Cal.4th 856, the declarant related a threat made by the defendant "many hours after it was made," but the California Supreme Court nevertheless concluded the evidence "amply support[ed] the conclusion that she was still under the influence of the stress and shock of the night's events" when she related the threat. (*Id*. at p. 926.) In *People v. Ledesma* (2006) 39 Cal.4th 641, the court characterized a span of 15 minutes as a "brief lapse of time," supporting an inference that the declarant was still under the influence of excitement caused by being robbed. (*Id*. at p. 709.) Moreover, witness testimony that the robbery victim "seemed nervous" and "sounded scared" when he described the robbery also supported a conclusion that he was still under the influence of nervous excitement. (*Ibid*.)

Here, 20 to 30 minutes is not much greater than the 15-minute lapse of time in *Ledesma*, and far shorter than the lapse of many hours in *Clark*. And similar to *Ledesma*, Phillip's own testimony establishes that he was still in a state of nervous panic when he made the 911 call. Reasonable trial counsel could have concluded that Phillip's statement relating defendant's admission qualified as a spontaneous statement under section 1240. Because "[c]ounsel is not required to proffer futile objections" (*People v. Anderson* (2001) 25 Cal.4th 543, 587), defendant's assertion of ineffective assistance lacks merit.

## DISPOSITION

The judgment is affirmed.

_____/S/_____
MAURO, J.

We concur:

_____/S/_____
EARL, P. J.

_____/S/_____
RENNER, J.