Filed 7/15/24  P. v. Saenz CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B328596 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA172684) |
| v. | |
| JOSE LUIS SAENZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found appellant Jose Saenz guilty of the 1998 kidnapping, rape, sodomy, and murder of the mother of his child. It also found him guilty of a 2008 murder and attempted murder, and found true numerous firearm enhancements and felony murder and multiple murder special circumstance allegations. The trial court found that appellant suffered a prior strike conviction as a juvenile, denied his *Romero*[1] motion to strike the strike and firearm enhancements, and sentenced him to 113 years to life, plus two consecutive terms of life without the possibility of parole.

The trial court denied appellant's motion to sever trial of the 1998 and 2008 charges. It also denied a joint motion to dismiss and withdraw the enhancement and special circumstance allegations, and overruled appellant's objection to testimony regarding efforts to locate him during his periods of absence from the Los Angeles area. Appellant contends these rulings and the denial of his *Romero* motion were erroneous and prejudicial. We disagree and affirm.

## PROCEDURAL HISTORY

The People filed an initial information against appellant in March 2014. The operative third amended information, filed during trial in September 2022, charged appellant with the July 1998 murders (Pen. Code, § 187, subd. (a))[2] of Josue Hernandez (count 1) and Leonardo Ponce (count 2); the August 1998 murder (count 3), kidnapping (§ 207, subd. (a), count 4), forcible rape (§ 261, subd. (a)(2), count 5), and sodomy by use of force (§ 286, subd. (c)(2)(A), count 8) of Sigreda Fernandez; the October 2008

---

[1]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.
[2]     All further statutory references are to the Penal Code unless otherwise indicated.

2

murder of Oscar Torres (count 6); and the October 2008 attempted willful, deliberate, and premeditated murder of Anthony L.[3] (§§ 187, subd. (a), 664, count 7).

The third amended information alleged that all four murders were committed willfully, deliberately, and with premeditation (§ 189, subd. (a)); that appellant committed multiple murders (§ 190.2, subd. (a)(3)); and that the 1998 murder of Fernandez was committed during the course of the kidnapping, rape, and/or sodomy (§ 190.2, subd. (a)(17)). The operative information further alleged that appellant personally and intentionally discharged a firearm and proximately caused great bodily injury or death while committing the murders and attempted murders charged in counts 1, 2, 3, 6, and 7 (§ 12022.53, subd. (d)), and personally used a handgun while committing the kidnapping and sexual assault offenses charged in counts 4, 5, and 8 (§ 12022.53, subd. (b)). It also alleged that appellant suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subd. (a)) and a one-year prison prior (§ 667.5, subd. (b)).

Appellant moved to sever trial of the 1998 charges from the 2008 charges. The People opposed the motion, which the trial court denied. The trial court also denied the People's motion to dismiss and withdraw all firearm, gang,[4] and special

---

[3]     We refer to the living victim and witnesses using initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)
[4]     The original and first amended informations alleged that the 1998 crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).) The second amended information is not in the appellate record, so it is unclear whether it contained gang allegations. However, the

circumstance allegations pursuant to Los Angeles County District Attorney George Gascón's Special Directives 20-08 and 20-08.1, which appellant joined. Appellant proceeded to jury trial in June 2022; the trial continued intermittently through September 2022.

The jury found appellant guilty of the 1998 crimes against Sigreda Fernandez, the 2008 murder of Oscar Torres, and the 2008 attempted murder of Anthony L. It also found true the firearm enhancements related to these crimes, the felony murder special circumstance, and the multiple murder special circumstance. The jury was unable to reach a verdict on counts 1 and 2, the 1998 murders of Josue Hernandez and Leonardo Ponce. The trial court declared a mistrial of counts 1 and 2 and later granted the People's motion to dismiss those counts in the interest of justice. The court also granted the People's motion to dismiss the prison prior. It denied appellant's motion for new trial on the other counts.

In a bifurcated proceeding, the trial court found that appellant suffered a prior strike, a juvenile robbery adjudication from 1992. The court denied appellant's *Romero* motion to strike the strike and the firearm enhancements and expressed an intent to impose the maximum possible sentence. It accordingly sentenced appellant to life without the possibility of parole (LWOP) for the murder of Sigreda Fernandez (count 3), plus 25 years to life for the related firearm enhancement. The trial court sentenced appellant to a consecutive term of LWOP for the

---

record indicates that the trial court granted appellant's motion to bifurcate trial of the gang enhancements and granted the People's motion to dismiss the gang allegations before the third amended information was filed. The third amended information does not include gang allegations.

4

murder of Oscar Torres (count 6), plus 25 years to life for the related firearm enhancement. It sentenced appellant to seven years to life for the attempted murder of Anthony L. (count 7), doubled to 14 years to life due to the strike, plus 25 years to life for the related firearm enhancement.  After finding true several aggravating factors under California Rules of Court, Rule 4.421, the court imposed the high term of eight years on the kidnapping (count 4), doubled to 16 years due to the strike; and two years (one-third of the six-year midterm), doubled to four years, on the rape and sodomy counts (counts 5 and 8), all to run consecutively. The court imposed and stayed sentence on the firearm allegations related to counts 4, 5, and 8.  It imposed fines and fees, and awarded appellant 3,715 days of custody credit.

Appellant timely appealed.

## FACTUAL BACKGROUND

I.  **1998 Crimes**

A.  **Hernandez and Ponce Murders[5]**

Adrian Parga, a Los Angeles Police Department (LAPD) officer and gang expert, testified that in 1998, appellant and another individual, Johnny Prado, were admitted members of the Cuatro Flats gang.  Parga testified that appellant, who was in his early 20s at the time, was in the "upper echelon" of the gang, and he and Prado both had reputations for being very violent. Another officer, Marcos Saenz (no relation to appellant), also testified that appellant was "one of the well known names in the area that younger members looked up to."  That area included the Pico Gardens housing project, which was proximate to other

---

[5]     Because appellant was not convicted of the murders of Hernandez or Ponce, we limit our discussion of the evidence related to these crimes.

public housing projects controlled by other gangs. The gangs were generally very territorial, and Cuatro Flats had rivalries with the gangs who controlled the other projects. One of those rivals was the East L.A. Trece or East L.A. 13 Dukes, which controlled the Aliso Village projects north of Pico Gardens.

Around 5:00 a.m. on July 25, 1998, two members of the East L.A. Trece gang, Josue Hernandez and Leonardo Ponce, were shot to death in the Aliso Village projects. Hernandez sustained four gunshot wounds, including two fatal shots to the head. Ponce suffered three fatal gunshot wounds to the back and torso. During an interview with LAPD detectives, witness Martin P. said he saw two perpetrators and heard "[l]ike, six" shots. Martin P. further told detectives that he heard the shooters belonged to Cuatro Flats. During trial, Martin P. testified that he did not see any perpetrators and did not remember making statements to detectives. Martin P. also denied making certain statements to Rogelio G., who testified that Martin P. told him appellant was one of the shooters.

**B.      Fernandez Kidnapping, Sexual Assault, and Murder**

In 1998, Sigreda Fernandez lived in the Aliso Village housing projects with her mother, Elia Rodriguez, and her infant daughter, Natalie. Appellant was Natalie's father. Appellant did not live with Fernandez and Natalie; he lived with his grandmother, Annie Honeycutt, several miles away from Aliso Village.

Rodriguez was deceased at the time of trial and her previous testimony was read into the record. She stated that she overheard Fernandez talking to appellant on the phone at some point prior to Fernandez's death. Fernandez appeared sad and

stressed, and cried during the conversation. Rodriguez heard Fernandez say "[t]hat she didn't want to know anything" or "be told anything" three times. Rodriguez also testified that Fernandez said appellant told her he did "something bad" during the phone conversation.

On August 5, 1998, Fernandez's cousin, Pedro A., and his girlfriend, Zaida C., were staying at Fernandez's and Rodriguez's home. In the early morning hours of August 5, 1998, Pedro A. and Zaida C. were asleep on living room couches downstairs, and Rodriguez, Fernandez, and Natalie were asleep upstairs. Pedro A. awoke to appellant knocking on the door, yelling to get inside. Pedro A. let appellant inside, and appellant went upstairs. Pedro A. returned to the couch to go back to sleep. Shortly thereafter, Pedro A. heard appellant and Fernandez yelling and arguing; Fernandez was crying, and Pedro A. got the impression that Fernandez wanted appellant to leave.

About five or 10 minutes later, appellant and Fernandez came downstairs. Appellant was behind Fernandez and had a black gun in his hand, which Pedro A. previously told detectives was pointed at Fernandez's head. Pedro A. previously told detectives that appellant said to him, "Your cousin threw a rat on me," which Pedro A. understood to mean that Fernandez had "snitched" on appellant to police. Pedro A. asked Fernandez if she was okay, and she said she was. She told Pedro A. that she was going to talk to appellant and asked Pedro A. to watch Natalie. Zaida C. testified that Fernandez had a "ghost face," or blank expression, when she left, and was not wearing any shoes. Zaida C. previously told detectives that appellant had a gun and was "kind of dragging" Fernandez down the stairs, but she denied both during trial.

7

Rodriguez testified that she heard appellant and Fernandez arguing but stayed in bed for a while. When Rodriguez got up, she saw that Fernandez was not there and had left in her pajamas; Rodriguez thought this was "odd." Pedro A. told Rodriguez that Fernandez had left with appellant, who had "forced her out." Pedro A. testified that Rodriguez began making phone calls and left the home, apparently in an effort to find Fernandez.

Carol Vildosola was a neighbor and friend of appellant's grandmother, Honeycutt. Vildosola was deceased at the time of trial; her previous testimony was read into the record, and a previous interview was played for the jury. According to Vildosola, Honeycutt and Vildosola went to Vildosola's house on the morning of August 5, 1998 because appellant told Honeycutt he needed to speak with Fernandez. Vildosola testified that she and Honeycutt went back to Honeycutt's house to get Honeycutt's cigarettes at some point, but appellant would not let them in; he handed Honeycutt her cigarettes through the door. Later, Honeycutt received a phone call from appellant, who told her not to go back to her house because he had done "something bad."

Vildosola and Honeycutt immediately went back to the house. The door was unlocked and appellant was gone. Vildosola saw a pair of men's pants on the floor in the front room. She then went to appellant's room, where she found Fernandez lying in bed. Vildosola called her name and tickled her feet, but Fernandez did not respond. Vildosola removed a cover from Fernandez's face and saw that she was dead. Vildosola ran next door and called the police.

Los Angeles County Sheriff's Department (LASD) deputy Robert Gray responded to the call. He testified that Fernandez

8

was lying in bed with an "apparent gunshot wound to her left temple." Fernandez was unclothed above the waist, and was wearing unzipped shorts below the waist. A pair of women's underwear was lying on the floor. Gray found 31 unfired .357 cartridges on top of the VCR, and a handwritten note on the dresser. The note said, "The guey that drove me did . . . not have nothing to do with anything or my grandma. I kicked her out. So fuck you, putos. . . . I love you, grandma." Gray explained that "guey" was slang for "fool," and "putos" "is another way of saying, like 'fuck you, little bitches.'" The name "Doreen" and "a little smiley face" were on the other side of the paper; Gray testified that Doreen was appellant's aunt. There was a second message handwritten on the wall: "Take care of Natalie. I love you, grandma, with all my heart. You're my one and only."

A Los Angeles County deputy medical examiner testified that Fernandez was killed by a close-range gunshot to the head. The medical examiner further testified that Fernandez had a fresh laceration to her lip and bruising and abrasions on her arms and hand. She also had "an area of slight redness at the back of the vagina" that "may or may not be trauma," and tearing to the anus that "suggests the possibility" that something had been inserted. The medical examiner took swabs of Fernandez's vagina and rectum. A senior criminalist later determined that both samples contained sperm cells consistent with appellant's DNA.

## II. 2008 Crimes

### A. Torres Traffic Stop

On August 6, 2008, Nicholas Lineback, a sheriff's deputy in St. Charles County, Missouri, conducted a traffic stop of a car on Interstate 70, a cross-country throughfare. The driver identified

9

himself as "Sam Palazzola," and the passenger identified himself as "Louie Sanchez." Lineback later learned that Sam Palazzola's true name was Oscar Torres.

Lineback noticed that both Torres and the passenger seemed nervous, and when separated they give disparate explanations for their cross-country travel in a rental vehicle. Lineback accordingly walked a K-9 officer around the car; after the dog alerted, Lineback and his partner searched the car and found approximately 55 vacuum-sealed packages of cash wrapped in dryer sheets[6] hidden inside the car doors. Some of the packages were labeled "EZ," and one was labeled "Toro" or "Toro Mix." Appellant used the nickname "Toro."

Lineback testified that there was a total of approximately $610,000 in the packages, and Torres and the passenger each had $5,000 in their pockets. Torres and the passenger denied any knowledge that there was money in the doors, and signed disclaimers to that effect. Lineback and federal Drug Enforcement Administration officers seized the money but did not arrest Torres or the passenger.

### B. Torres Murder and Anthony L. Attempted Murder

Deputy Gray testified that Oscar Torres was "one of the leaders" and "main money men through narcotics" of the Lott Stoners gang in Los Angeles. He went by the names "Easy O," "Easy," and "Sam." Louie Sanchez, the passenger stopped with Torres in Missouri, was also a member of the Lott Stoners. The Lott Stoners trafficked drugs from Mexico to the Chicago

---

[6] Lineback testified that vacuum sealing and dryer sheets are both used to disguise drug odors.

suburbs, then "out toward L.A." The Lott Stoners had "sort of an alliance and definitely not a rivalry" with Cuatro Flats.

Torres owned and operated businesses that rented bounce houses and limousines. On the night of October 4, 2008, Torres asked his friend, Anthony L., to drive some friends of Torres's around in a black Hummer limousine. Anthony L. picked up a "small group" of men in Boyle Heights. Torres mentioned that another man named "Toro" might call as well, and later called Anthony L. to see if he had. Toro—appellant—did call, and Anthony L. picked him up in the parking lot of a bar. Anthony L. drove appellant and the other men around through Hollywood and to various bars and nightclubs.

At some point in the early morning hours of October 5, 2008, appellant directed Anthony L. to drive to Torres's house in Whittier. When they arrived, appellant and another man, later identified as Johnny Prado, got out of the limo and went to Torres's door. Anthony L. joined them, intending to use the restroom.

Maria D., who was dating Torres and had stayed at his house that night, testified that she heard people knocking on the door and calling Torres's name around 4:00 or 5:00 a.m. She woke up Torres, who looked at surveillance camera monitors in the bedroom. Torres "saw who it was and then he went back to bed." The knocking continued; Maria D. testified that it became louder and "more insistent." Torres looked at the monitors again. Maria D. looked too, and saw people standing on the porch. Around that time, Jesus "Rabbit" T., who was renting a room in the house, heard people banging on the door and windows and saying "Easy." Rabbit knocked on Torres's bedroom door and told him people were there for him. Torres got up and went to the

11

front door of the house wearing only his boxer shorts.  Maria D. testified that he did not take a gun with him; she had never seen guns in the house.

Torres opened the door.  Anthony L. testified that he did not appear agitated or angry.  Appellant entered the house first, followed by Anthony L. and Prado.  Anthony L. testified that appellant and Prado immediately drew guns. Torres did not have a gun or any other weapon.  Torres said something to appellant, and Anthony L. stepped between them, "trying to calm everything down."  Appellant told Torres, "You gotta go," which Anthony L. understood to mean that appellant wanted to hurt Torres.  Anthony L. said something like, "What the hell" and told appellant to relax.

The conflict then "escalated to a different level," and Anthony L. began wrestling with Prado over Prado's gun. Anthony L. closed his eyes because he was scared. He felt someone hitting him on the back of the head "until it cracked my head open."  Anthony L. heard someone say, "Dome him," which he understood to mean "kill him" and Gray testified means "to shoot someone in the head."  Anthony L. was subsequently shot twice in the lower back.

Rabbit testified that after he woke up Torres, he went back to bed.  He heard Torres answer the door and say something like, "What the f are you doing here."  He then heard "a fight or something," and then one or two gunshots.  When he heard gunfire, Rabbit jumped out the window of his bedroom, ran across the backyard, and jumped over a wall into a neighboring yard. He heard about seven or eight more gunshots as he was running, and then heard a car leave.  After about 20 or 30 minutes, he returned to the house and saw Anthony L. lying on the couch.

Rabbit testified that Anthony L. told him, "they shot us"; Anthony L. recalled telling Rabbit that Toro shot him. Rabbit also further testified that Anthony L. said something like "Oscar is outside, open the door." Rabbit opened the door and saw Torres lying in the front yard, apparently dead. He called 911. Anthony L. said he saw someone lying on the ground outside when paramedics transported him to an ambulance.

Maria D. testified that she heard Torres open the door. She then heard conversations that escalated to arguing and what sounded like pushing and shoving. She got dressed and hid in the bedroom closet. Maria D. then heard Torres say, "No, Toro, no," and heard "gunshots, and then running around, commotion, more gunshots." She heard footsteps near her and all over the house, and then "heard the limo take off." Maria D. got out of the closet when she heard Rabbit's voice. She saw Anthony L. "lying on the sofa bleeding and Rabbit asking him what had happened, who had done it, and then Anthony said it was Toro." Maria D. then left the house through the front door, and she saw Torres lying on the front lawn.

Torres was dead. A deputy medical examiner testified that Torres suffered six gunshot wounds to the back side of his body, including his back, buttocks, and legs; four gunshot wounds to the face; and one to the top of the head. The gunshot wounds to the face and head were immediately fatal and were surrounded by stippling, indicating the gun was within two feet when it was fired. The gunshot wounds to the back were "potentially fatal," but not immediately so; the medical examiner opined that one near Torres's spine could have paralyzed him and prevented him from continuing to run.

LASD homicide detective Linda Muse responded to the scene. During her search of the home, she found a "DVD system" in the closet of Rabbit's bedroom; Rabbit testified that the system was not his and he "assumed" it was Torres's. The DVD tray was open and empty, but a "tech person" was able to download video from the system's hard drive. The video, from the home's surveillance cameras, was played for the jury. It showed the limo arrive; appellant, Prado, and Anthony L. approach and enter the house; Torres run out of the house approximately 30 seconds later; appellant shoot Torres multiple times as Torres ran away; and appellant stand over Torres's fallen body and shoot him at close range.

In addition to the video footage, law enforcement recovered between $8,000 and $9,000 in cash from Torres's home. They also found several guns inside the bench of a sauna in Torres's bedroom and "pay and owe sheets" recording drug transactions. One of the pay and owe sheets had several dates in June and July 2008 and said "Toro." Another included a sticky note that said, "Toro cooked" and "37,200"; Gray testified that "cooked" meant the manufacture of methamphetamine. Law enforcement did not find any drugs, but Gray testified that the Lott Stoners typically kept drugs in "safe houses" or "stash houses" separate from their own residences to avoid detection from law enforcement.

Around noon on October 5, 2008, a black Hummer limousine was found in Norwalk. The rear passenger door was open, and the lights were on. A responding LASD deputy ran the license plates, learned that the limo had been "involved in a particular incident," and called the crime lab while another officer cordoned off the area with crime scene tape. A senior criminalist responded to the scene and swabbed the limo for

14

DNA.  Later testing of the swab from the limo's door handle showed four contributors.  None of the contributors was in the DNA database at the time.  Later, in 2022, a different criminalist obtained a reference DNA sample from appellant.  Appellant was then identified as one of the four contributors to the DNA sample taken from the limo door.

## III.  Efforts to Locate Appellant

Appellant was identified as a suspect within days of the Hernandez and Ponce shootings, but officer Saenz testified that he and other law enforcement officials were unable to locate appellant.  Parga also testified that he never saw appellant in the projects or Los Angeles area after these shootings.  Gray, who was assigned to the Fernandez case, also was unable to locate appellant.  Muse, who was assigned to the Torres case, received numerous tips that led her to nightclubs and other locations around Los Angeles, as well as to El Paso, Texas and Lafayette, Louisiana.  Her search also proved unsuccessful.

Scott Garriola testified that he was a retired FBI special agent who had been assigned to the "fugitive task force."  As a member of the task force, he assisted local homicide detectives in locating suspects.  In 2001, an LASD detective asked Garriola for assistance in locating appellant, who had been identified as a suspect in the 1998 murders of Hernandez, Ponce, and Fernandez.  Garriola initiated a "routine fugitive investigation," pursuant to which he and the task force located appellant's family members, friends, and associates in an effort to obtain information about appellant's whereabouts.  Garriola also surveilled locations in the Los Angeles area, including appellant's grandmother's house, funerals of Cuatro Flats members, and Fernandez's gravesite.  The task force put up billboards in Los

15

Angeles, issued press releases, and featured appellant on local and national television shows, including "America's Most Wanted."

In 2008, an FBI agent based in El Paso, Texas contacted Garriola and told him that "the detectives are here talking about a case involving one of your fugitives." Garriola then learned that appellant was a suspect in the Torres murder, of which he had been unaware. Garriola watched the surveillance video from Torres's home and recognized appellant and Prado. Garriola then "intensified" the search for appellant, doing more publicity and speaking with Cuatro Flats members. Through these efforts, Garriola obtained "very good information" that appellant was traveling between Mexico and Guatemala. Garriola made six trips to Mexico, two trips to Guatemala, and one trip to El Salvador to look for appellant.

In 2012, Garriola and the task force "were able to finally pin him down to an area of Guadalajara, Mexico." Garriola spent about two weeks in Guadalajara, working with a "specialized" team of Mexican agents. After he returned to the United States, Garriola received word that Mexican police had arrested appellant. Garriola returned to Mexico, and he and another agent escorted appellant back to the United States.

## DISCUSSION

### I. Motion to Sever

#### A. Background

On October 7, 2021, appellant filed a motion to sever trial of the 1998 charges and the 2008 charges. He argued that severance was required for three reasons. First, the evidence underlying the charges was not cross-admissible. Second, the 1998 crimes were "vastly more inflammatory" than the 2008

16

crimes because they involved alleged "gang animosity" and the murder of his child's mother in his grandmother's house. By contrast, appellant asserted that the 2008 crimes "arose out of a dispute over the proceeds of a drug deal," a scenario "so commonplace . . . that it would not be entirely surprising if the jurors struggle to stay awake during the presentation of the evidence related thereto." Third, appellant asserted that he wanted to testify that he acted in self-defense during the 2008 crimes, but had "a strong need to refrain from testifying on the other counts, because doing so will permit him to be impeached with prior convictions, thereby prejudicing him before the jury."

The People opposed severance. They argued that joinder was proper under section 954 because the 1998 and 2008 crimes were of the same class. They further argued that cross-admissibility of evidence was not required for joinder, and "one murder is no more inflammatory than the next." The People also asserted that appellant had not carried his burden of showing that he had important testimony for the 2008 crimes, and that they could impeach him with the 1998 crimes even if trial were severed.

The court heard the motion on February 4, 2022. Appellant offered to make an in-camera disclosure of his proposed testimony related to the 2008 crimes. He also argued that the crimes occurred 10 years apart and had no evidence in common. The People responded that appellant "created this lapse in time" by fleeing, that the murders shared a similar modus operandi, and that judicial economy supported joinder of the charges. Appellant replied that the prejudice to him of trying the crimes together outweighed any judicial economy.

17

Citing the "clear" preference for keeping "counts and similar charges together," the court concluded the 1998 and 2008 crimes should be tried together. However, the court stated that its ruling was without prejudice, and invited appellant to file under a seal a declaration of his proposed testimony related to the 2008 charges.

Appellant subsequently submitted a declaration under seal. He argued that severance was necessary in light of that proposed testimony. The People reiterated their previous arguments in favor of joinder. The court again denied the motion to sever, stating it was "satisfied that the counts are properly joined and should be joined." It also stated that it would revisit the issue if appellant had anything further to present.

Appellant raised the issue of his proposed testimony at the conclusion of the People's case. He requested that he be allowed to testify regarding the 2008 charges only, "and that there be no questioning of him of the other incidents." Over the People's objection, the court ruled that appellant could "testify as to whatever counts he wants," and the People "can't go anywhere beyond that" in cross-examination, including using "the other acts in this case as prior bad acts." Appellant did not testify.

## B. Analysis

Under section 954, a trial court may consolidate or join two or more accusatory pleadings that charge offenses "of the same class of crimes or offenses." (§ 954.) There is no dispute this requirement was satisfied here; appellant concedes the 1998 and 2008 incidents all involved "assaultive crimes against the person." (*People v. Alvarez* (1996) 14 Cal.4th 155, 188 [rape and murder are assaultive crimes against the person].) "Because it

18

ordinarily promotes efficiency, joinder is the preferred course of action." (*People v. Scott* (2011) 52 Cal.4th 452, 469.)

However, the court "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (§ 954.) We review the court's decision not to sever trial of joined charges for abuse of discretion. (*People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*).) "In order to establish an abuse of discretion, defendant must make a 'clear showing of prejudice.'" (*Ibid.*; see also *People v. Simon* (2016) 1 Cal.5th 98, 123 (*Simon*).)

Whether a trial court abused its discretion in denying severance depends on the particular circumstances of each case, as they were known to the court at the time of its ruling. (*Simon*, *supra*, 1 Cal.5th at p. 123; *Thomas*, *supra*, 53 Cal.4th at p. 798.) We consider four primary factors in assessing the court's exercise of discretion: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*Simon*, *supra*, 1 Cal.5th at p. 123.) The first factor, cross-admissibility of evidence, may be determinative: "if evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." (*Alcala v. Superior Court* (2008) 43 Cal.4th

19

1205, 1221.)  However, the converse is not true.  (See § 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"].)  The "complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance."  (*Ibid.*; see also *id.* at pp. 1221-1222 [collecting cases].)  "In the absence of cross-admissibility, we turn to the remaining factors to assess whether the trial court abused its discretion."  (*Simon, supra*, 1 Cal.5th at pp. 123-124.)

Appellant contends there was no cross-admissible evidence concerning the 1998 and 2008 crimes because they "took place a decade apart," had "no common witnesses or codefendants," and had "entirely different" motives.  The People respond that evidence of appellant's flight and law enforcement efforts to locate him was cross-admissible, as was evidence of appellant's modus operandi of confronting his victims early in the morning and shooting them in the head, and his "common plan . . . to perpetrate attacks that were callous, violent, and unprovoked."  The People further assert that evidence of the common features of the crimes was cross-admissible to demonstrate identity, and to refute appellant's assertion that he acted in self-defense in 2008.

We agree with the People that evidence regarding the common features of the 1998 and 2008 crimes was cross-admissible.  Under Evidence Code section 1101, subdivision (b), evidence of criminal acts may be admitted if the acts are "relevant to prove some fact ... other than [the defendant's] disposition to commit [a criminal] act."  Evidence admitted under subdivision (b) may be used to prove motive, intent, common

20

design or plan, and identity. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 & fn. 6.) Here, all of the charged crimes were committed in the early morning hours and involved shootings to the head and/or back. The similarities between the 1998 and 2008 crimes called into question appellant's argument that he acted in self-defense on the latter occasion.

Even if there were no cross-admissible evidence, however, we would find no abuse of the court's discretion in denying the motion to sever because the other two relevant factors weigh in favor of joinder. As to the second factor, whether certain charges were more inflammatory than others, appellant asserts that the 1998 crimes against Fernandez were "unquestionably more inflammatory" than the 2008 crimes because they were heinous and involved the mother of his child, while the 2008 crimes involved "one drug dealer shooting another." As the People point out, however, appellant "overlooks the viciousness of the Torres murder, where appellant woke his victim up from his sleep to shoot him 11 times in his front yard as he ran for his life in his underwear." Appellant also overlooks the other two charged 1998 crimes, which were more similar in kind to the 2008 crimes. The jury failed to reach a verdict on those crimes despite their proximity in time to the crimes against Fernandez and the People's argument that appellant killed Fernandez to prevent her from telling anyone about his involvement in them, indicating that the nature of the Fernandez crimes did not cause undue prejudice.

Appellant also argues that the third factor, whether a weak case has been joined with a strong case, "is similar," because the evidence in the Fernandez case "is significantly stronger than the evidence of the murder of Oscar Torres." He focuses particularly

on the evidence that he was the perpetrator, which he asserts was "much weaker" in the Torres murder than in the Fernandez crimes. "In order to demonstrate the potential for a prejudicial spillover effect, defendant must show an 'extreme disparity' in the strength or inflammatory character of the evidence." (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1436.) Appellant has not made that showing here. Video evidence depicted appellant shooting Torres, both as he ran away and as he lay on the ground. DNA evidence also linked appellant to the limousine, and multiple witnesses placed him at the scene. Moreover, appellant again ignores the other 1998 crimes; the jury's inability to reach a verdict suggests that the evidence of those crimes was weaker than the evidence in the Torres case. As none of the relevant factors indicates severance was improper, we conclude that appellant failed to carry his burden of demonstrating the clear prejudice necessary to establish an abuse of discretion.

Appellant finally argues that even if the trial court properly denied his motion to sever, reversal of the convictions on the 2008 charges is required because the joinder resulted in gross unfairness amounting to a denial of due process. (See *People v. Soper* (2009) 45 Cal.4th 759, 783; *Simon*, *supra*, 1 Cal.5th at p. 123.) We may reverse on this ground "only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, *supra*, 1 Cal.5th at pp. 129-130.) The burden of establishing that a trial was grossly unfair thus is a heavy one, and appellant has failed to carry it. (See *People v. Soper*, *supra*, 45 Cal.4th at p. 783.)

Appellant contends that joinder of the 1998 and 2008 charges "resulted in the admission at trial of a plethora of gang-related expert testimony, exploited by the prosecutor to

appellant's detriment in closing argument to the jury."[7] Specifically, he asserts that the evidence regarding appellant's gang membership and the gang-related motives for the Hernandez and Ponce murders improperly tainted trial of the 2008 crimes, because "there was no evidence that appellant killed Torres for a gang-related reason" and the evidence regarding the 2008 charges was relatively weak. "The danger here," he argues, "was that the jury would consider appellant guilty of the Torres charges because they had heard that he and Prado were violent gang members who should be punished despite the weakness of the evidence."

As discussed above, the evidence in the 2008 cases was quite strong: DNA placed appellant in the limo, witnesses placed him at the scene, and video showed him shooting Torres multiple times. Maria D. testified that she heard Torres say "No, Toro, no," before the first gunshots were fired, and she and Anthony L. both testified that Anthony L. said Toro shot him. The evidence also showed that Torres was a high-ranking gang member who trafficked in narcotics and lost a substantial sum of drug money during the traffic stop in Missouri, some of which was earmarked for appellant. That renders this case distinguishable from *People v. Albarran* (2007) 149 Cal.App.4th 214, in which the court concluded that much of the "panoply of incriminating gang evidence" had "no legitimate purpose in [the] trial." (*Id.* at pp. 227, 230.)

The trial court also instructed the jury that the gang evidence was admitted only for the limited purposes of deciding whether appellant "acted with the intent, purpose, and knowledge that are required to prove [he] had a motive to commit

[7]     Appellant did not object to the prosecutor's argument.

23

the crimes charged," and whether he "actually believed in the need to defend himself." The jury was expressly instructed to "not consider this evidence for any other purpose," and to "not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume the jury followed these limiting instructions. (*Simon*, *supra*, 1 Cal.5th at p. 130.) That presumption is bolstered here by the jury's failure to convict appellant of the Hernandez and Ponce murders alleged to be gang-motivated. "Where the jury returns a guilty verdict of a lesser crime, or, as here, fails to convict at all on some charges, we are confident the jury was capable of, and did, differentiate among defendant's crimes." (*People v. Jones* (2013) 57 Cal.4th 899, 927.)

Appellant has not shown that it is reasonably probable the jury relied on gang evidence instead of the strong evidence warranting conviction of the 2008 charges. We accordingly find no gross unfairness or violation of due process due to joinder.

## II.    Evidence of Efforts to Locate Appellant

### A.    Background

Before detective Muse took the stand, appellant objected to testimony concerning "her efforts to find Mr. Saenz" as "irrelevant" and unduly prejudicial under Evidence Code section 352. The People argued that Muse's efforts were relevant "for the purpose of flight and consciousness of guilt and . . . why he wasn't apprehended until November of 2012." They also asserted that Muse's testimony was "a high-level overview of what efforts she made, meaning she didn't give up looking for him." The court overruled appellant's objection after confirming that the People planned to introduce evidence that appellant was apprehended in Mexico. Muse testified about her efforts to locate

24

appellant, including her consultation with Garriola and her trips to Texas and Louisiana without further objection from appellant.

Later, before the People called Garriola, appellant objected to his testimony under Evidence Code section 352 as "hugely prejudicial and not probative." Appellant specifically objected "to any questioning about putting up billboards and $100,000 rewards, $20,000 rewards" and appellant's appearances on "America's Most Wanted" and the FBI's ten most wanted list as "highly prejudicial." The People responded that appellant had stated in interviews that he had seen himself on "America's Most Wanted" and "knew they were looking for him." They further stated that they wanted Garriola to testify about billboards placed in Los Angeles, in case there was "any suggestion that he was in Los Angeles." The court ruled that "billboard testimony can come in, as can America's Most Wanted. The ten most wanted list, no. That stays out under 352." Garriola testified as summarized above without further objection from appellant.

B.    Analysis

Appellant contends the court erred in permitting Garriola to testify about the efforts he and the fugitive task force undertook to locate appellant. He argues that Garriola's testimony was not "relevant to demonstrate appellant's consciousness of guilt," because Muse "had already established that appellant had 'flown the coop' and that was evidence of flight." He further asserts that Garriola's "graphic testimony . . . tended to prove nothing about appellant's consciousness of guilt" because it did not relate "to appellant, his actions, or his state of mind." Appellant also argues that Garriola's testimony violated his due process rights, because it portrayed him as "dangerous and 'evil' (as the prosecutor argued) in a way that overshadowed

the evidence in the case and encouraged the jury to convict him, particularly on the Torres case, based on his status as a 'Most Wanted' criminal, rather than on the evidence properly admitted against him."

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) All relevant evidence is admissible unless excluded by statute or Constitutional requirement. (Evid. Code, § 351; *People v. Carter* (2005) 36 Cal.4th 1114, 1166 (*Carter*).) "The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." (*Carter*, *supra*, at pp. 1166-1167.) The trial court also has broad discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence is not unduly prejudicial merely because it is damaging to a party. Instead, evidence should be excluded as unduly prejudicial when it is likely to inflame the emotions of the jury and cause the jury to use it for an illegitimate purpose. (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) We review a trial court's evidentiary rulings for abuse of discretion. (*Id.* at p. 437.)

We find no abuse of that discretion here. Evidence of a defendant's flight, avoidance of apprehension, and whereabouts prior to his or her arrest is "highly probative of his [or her] participation in the crimes and of his [or her] consciousness of guilt." (*People v. Neely* (1993) 6 Cal.4th 877, 896-897.) "Evidence showing consciousness of guilt, such as flight or escaping from

26

jail, is generally admissible within the trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391.) Appellant acknowledges this, but asserts that law enforcement efforts to locate him during his flight "tended to prove nothing about his consciousness of guilt." We disagree. Although law enforcement efforts to locate appellant did not speak directly to his consciousness of guilt, they tended to show that appellant went to great lengths to elude law enforcement for an extended period of time. The jury could infer a greater consciousness of guilt from this evidence, particularly given the severity of the crimes with which appellant was charged. Appellant suggests that if he "did not know he was fleeing from the FBI, his actions cannot be said to prove consciousness of guilt." Appellant does not cite any authority for this proposition, which we find unpersuasive. "[T]he existence of alternate explanations for the defendant's behavior does not necessarily defeat the court's discretion to admit consciousness-of-guilt evidence." (*Ibid.*)

We are similarly unpersuaded by appellant's contentions that the evidence was unduly prejudicial or violative of his due process rights. The trial court excluded evidence that appellant was on the FBI's ten most wanted list. It also instructed the jury that "evidence that the defendant fled cannot prove guilt by itself," and "it is up to you to decide the meaning and importance" of appellant's flight-related conduct. We presume the jury followed these instructions. (*Simon, supra,* 1 Cal.5th at p. 130.)

To the extent there was any error in admitting the evidence, we would find it harmless. "[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations under the 'reasonable probability' standard" of *People*

*v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Marks* (2003) 31 Cal.4th 197, 227.) However, even if we were to apply the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24, as appellant urges, we would reach the same conclusion. The evidence implicating appellant in the 1998 crimes against Fernandez and the 2008 crimes against Torres and Anthony L. was strong. Appellant does not challenge the admission of Muse's and other law enforcement officers' testimony regarding appellant's flight and their inability to locate him. Any error in admitting Garriola's testimony to the same effect was harmless beyond a reasonable doubt. Indeed, even after hearing Garriola's testimony, the jury was unable to reach a verdict on the Hernandez and Ponce murders, indicating that it did not rely on prejudice. Because we have rejected appellant's claims of error and prejudice, we also reject his claim of cumulative prejudice. (See *People v. Duong* (2020) 10 Cal.5th 36, 75.)

## III. Denial of *Romero* Motion

### A. Background

After the jury returned its verdicts, the court held a bench trial at which it found that appellant suffered a prior strike, a juvenile robbery adjudication from 1992. In his motion for new trial, appellant requested that the court strike the strike pursuant to section 1385, subdivision (a) and *Romero, supra*, 13 Cal.4th 497 . Appellant argued that he was 16 years old at the time of the conviction, which itself was 30 years old. He also argued that he faced multiple life sentences even without the strike, such that his prospects "for committing future crimes are virtually nil" and there was no societal interest in using the strike to lengthen his sentence further. At the hearing on the

28

motion, appellant reiterated his contention that the base sentenced he faced was "more than sufficient for these particular crimes." The court denied the *Romero* motion and used the strike conviction to double appellant's determinate sentences. It found while sentencing appellant that there were several aggravating factors warranting imposition of high term sentences and no mitigating factors. The court also found that appellant deserved the "maximum amount of time" for the crimes, which were "cold-blooded," "brutal," and supported by overwhelming evidence.

### B. Analysis

A trial court must decide whether to strike a prior strike by considering factors that are intrinsic to the Three Strikes law's sentencing scheme. (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) These factors include: (1) the nature and circumstances of the current conviction; (2) the nature and circumstances of the prior strike conviction; and (3) the defendant's "background, character, and prospects." (*Ibid.*) If the defendant falls outside the spirit of the Three Strikes law, the court may, in furtherance of justice, treat the defendant "as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*Ibid.*; see also *Romero*, *supra*, 13 Cal.4th at pp. 529-530; § 1385, subd. (a).) We review a trial court's denial of a *Romero* motion for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

We conclude that the trial court did not abuse its discretion in declining to strike appellant's strike. The court properly considered the nature and circumstances of the current

29

convictions, all of which involved violent, assaultive crimes. It also considered appellant's character, including his continued disrespect during the proceedings. The court reasonably could conclude that the constellation of these circumstances supported imposition of the maximum sentence, including the strike.

Appellant contends the remoteness of his prior strike warranted striking it. We disagree. The trial court is not obligated to "simply consult the Gregorian calendar with blinders on." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) An older prior strike conviction may "wash out" if a defendant has demonstrated rehabilitation in the intervening years. But if a defendant "has led a continuous life of crime after the prior, there has been no 'washing out' and there is simply nothing mitigating about a 20-year-old prior." (*Ibid.*) The court need not "overlook the fact defendant consistently committed criminal offenses." (*People v. Philpot* (2004) 122 Cal.App.4th 893, 906.) Here, appellant suffered the strike in 1992. He suffered two additional convictions in 1994 and 1995, only three years before he committed the 1998 crimes against Fernandez. Appellant subsequently fled, returning only to commit further crimes in 2008 before fleeing again until 2012. This conduct "as a whole was a strong indication of unwillingness or inability to comply with the law" (*ibid.*), not rehabilitation.

Appellant also contends that the trial court abused its discretion because he faced a life sentence even without the strike. He asserts "there was no 'interests of justice' in using the 30-year-old prior to double the determinate sentences to run consecutively with the life sentence." Appellant relies on *People v. Garcia* (1999) 20 Cal.4th 490, 500 (*Garcia*), which states that "a defendant's sentence . . . is the overarching consideration

because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences." Appellant also cites *Garcia* for the proposition that once a defendant was sentenced to a term of 30 years to life on one burglary conviction, "his 'prospects' for committing future burglaries diminished significantly." (*Ibid.*)

Appellant's reliance on *Garcia* is misplaced. In *Garcia,* the issue was "whether, and in what circumstances, a trial court in a Three Strikes case may strike prior conviction allegations as to one count, but not as to another." (*Garcia, supra,* 20 Cal.4th at p. 496.) The defendant in *Garcia* was convicted of two burglaries, and the trial court struck his prior strikes when imposing sentence on one burglary conviction but not the other. (*Id.* at pp. 494-495.) The Supreme Court held that a trial court "may find adequate justification for striking one or more prior conviction allegations, but may deem appropriate the sentence that results from striking the prior conviction allegations as to only some counts. When a proper basis exists for a court to strike prior conviction allegations as to at least one current conviction, the law does not require the court to treat other current convictions with perfect symmetry if symmetrical treatment would result in an unjust sentence." (*Id.* at p. 500.) It is in this context that the court observed that "once the trial court had sentenced defendant to a term of 30 years to life for the [first] burglary, his 'prospects' for committing future burglaries diminished significantly" and the trial court properly could rely on that circumstance to strike the defendant's strikes when imposing sentence for the second burglary. (*Ibid.*)

Contrary to appellant's suggestion, *Garcia* does not hold that a trial court abuses its discretion by declining to strike a

31

strike when the defendant faces a lengthy sentence. It instead holds that the trial court need not use prior strikes uniformly when sentencing a defendant on multiple counts, and that "a defendant's sentence is also a relevant consideration when deciding whether to strike a prior conviction allegation." (*Garcia*, *supra*, 20 Cal.4th at p. 500.) Here, the trial court considered the length of appellant's potential sentence and concluded that "the maximum sentence that the law allows" was warranted. This was not an abuse of discretion under the circumstances of this case.

## IV. Denial of Joint Motion to Withdraw Allegations
### A. Background

On January 6, 2021, the People filed a motion to dismiss and withdraw all firearm, gang, and special circumstance allegations pursuant to section 1385 and Los Angeles County District Attorney George Gascón's Special Directives 20-08 and 20-08.1. The trial court preliminarily denied the motion the same day, ruling that "it takes my permission" for the prosecution to dismiss enhancement and special circumstance allegations after the information is filed. However, it noted that it was "supposed to look at the interest[s] of justice" to the defendant and the public before making a final decision, and invited the parties to submit further filings about why dismissal of the allegations would serve the interests of justice.

Appellant subsequently filed a written joinder to the motion, in which he argued that the People had "sole" and "absolute" discretion to "elect which charges or enhancements to prosecute," and the trial court was prohibited from interfering with this discretion. After reviewing that filing and holding a

hearing, a reporter's transcript of which is not in the appellate record, the court denied the motion.

## B. Analysis

Appellant argues that the court erred in denying the motion because the People have the sole discretion to charge and prosecute crimes, and the court lacks authority to limit that discretion. We disagree.

A "prosecutor's motion to dismiss an enhancement under section 1385 is not 'a constitutionally protected exercise of prosecutorial discretion.'" (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 499.) "[O]nce a district attorney files charges and invokes the court's jurisdiction, only the court, not the district attorney, can dismiss an action or enhancement under section 1385." (*Id.* at pp. 499-500.) The court must "exercise its discretion in determining whether dismissal furthers the interests of justice." (*Id.* at p. 501.) That requires the court to undertake a case-specific assessment as to whether dismissal of enhancement and special circumstance allegations is warranted. (*Ibid.*) Relevant factors include "circumstances specific to the crime and the defendant's criminal history, as well as . . . broader societal objectives" and the policies underlying the Special Directives. (*Id.* at pp. 485, 497, 501-502.) We review the trial court's discretionary ruling for abuse of its discretion.

Aside from his assertion that the trial court lacked the authority to deny the motion, appellant has raised no argument that the trial court abused its discretion. Even if he had, we would find no error. Nothing in the record indicates the court misunderstood the scope of its discretion or failed to consider appropriate factors in exercising that discretion. To the contrary, the court acknowledged that its discretion turned on the interests

of justice, and it invited the parties to file additional briefing on that topic. The record also reflects that the court considered that briefing as well as the parties' oral arguments before making its final ruling.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.

We concur:


MORI, J.


ZUKIN, J.